# EXHIBIT B


**CORPORATE CREATIONS**®
Registered Agent • Director • Incorporation

**Corporate Creations Network Inc.**
801 US Highway 1 North Palm Beach, FL 33408

Tenneco Automotive Operating Company Inc.                    08/15/2022
Alicia Ng
DRiV
7450 N. McCormick Blvd
Skokie IL 60045

# SERVICE OF PROCESS NOTICE

The following is a courtesy summary of the enclosed document(s).  **ALL information should be verified by you.**

Item: 2022-438

Note: Any questions regarding the substance of the matter described below, including the status or how to respond, should be directed to the contact set forth in line 12 below or to the court or government agency where the matter is being heard. IMPORTANT: All changes or updates to the SOP contact individuals or their contact information must be submitted in writing to SOPcontact@corpcreations.com. Any changes will become effective upon written confirmation of Corporate Creations.

| | | |
|---|---|---|
| 1. | **Entity Served:** | Tenneco Automotive Operating Company Inc. |
| 2. | **Title of Action:** | MCS Manufacturing LLC vs. Tenneco, Inc. |
| 3. | **Document(s) Served:** | Summons on Complaint<br>Complaint for Damages with Jury Demand Endorsed Hereon |
| 4. | **Court/Agency:** | Fulton County Common Pleas Court |
| 5. | **State Served:** | Ohio |
| 6. | **Case Number:** | 22CV000133 |
| 7. | **Case Type:** | Breach of Contract - U.C.C. |
| 8. | **Method of Service:** | Certified Mail |
| 9. | **Date Received:** | Friday 08/12/2022 |
| 10. | **Date to Client:** | Monday 08/15/2022 |
| 11. | **# Days When Answer Due:**<br>**Answer Due Date:** | 28<br>Friday 09/09/2022    CAUTION: Client is solely responsible for verifying the accuracy of the estimated Answer Due Date. To avoid missing a crucial deadline, we recommend immediately confirming in writing with opposing counsel that the date of the service in their records matches the Date Received. |
| 12. | **Sop Sender:**<br>(Name, City, State, and Phone Number) | Shumaker, Look & Kendrick, LLC<br>Toledo, OH<br>419-241-9000 |
| 13. | **Shipped To Client By:** | Email Only with PDF Link |
| 14. | **Tracking Number:** | |
| 15. | **Handled By:** | 361 |
| 16. | **Notes:** | None |

NOTE: This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information.  At Corporate Creations, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process.  To decrease risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective.  It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by Corporate Creations Network Inc.

## In The Court of Common Pleas
## Fulton County, Ohio

| | | |
|---|---|---|
| **MCS MANUFACTURING LLC** | : | **Case No. 22CV000133** |
| PLAINTIFF | : | |
| **Vs.** | : | Judge Jeffrey L. Robinson |
| **TENNECO INC** | : | |
| DEFENDANT | : | **SUMMONS ON COMPLAINT** |

TO: **TENNECO AUTOMOTIVE OPERATING**
**COMPANY INC**
**C/O CORP CREATIONS NETWORK INC S/A**
**119 E COURT STREET**
**CINCINNATI, OH   45202**

YOU ARE HEREBY SUMMONED that a complaint (a copy of which is hereby attached and made a part hereof) has been filed against you in this court by the Plaintiff(s) named herein.

You are required to serve upon the Plaintiff(s)attorney, or the Plaintiff if the plaintiff has no attorney of record, a copy of your answer to the complaint within ***twenty eight (28)*** days after service of this summons upon you, exclusive of the day of service.  Said answer must be filed with this court within ***three (3)*** days after service on the Plaintiff(s) attorney.  The address of the *Clerk of the Fulton County Court of Common Pleas is Room 102, Courthouse, 210  S. Fulton Street, Wauseon, Ohio   43567*.

The name and address of the Plaintiff(s) Attorney is as follows:
NICHOLAS T STACK
1000 JACKSON STREET
TOLEDO, OH 43604-5573

If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

Tracy L. Zuver
Fulton County Clerk of
Common Pleas Court

August 8, 2022

*Selma Ruiz*

Deputy Clerk of Courts

FILED
FULTON COUNTY
OF COMMON PLEAS COURT

2022 AUG -8  AM 10: 12

TRACY L. ZUVER
CLERK

## IN THE COURT OF COMMON PLEAS
## FULTON COUNTY, OHIO

| | |
|---|---|
| MCS MANUFACTURING, LLC,<br>15210 County Rd. 10-3<br>Lyons, Ohio 43533,<br><br>       Plaintiff,<br><br>-vs-<br><br>TENNECO, INC.,<br>c/o The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801<br><br>and<br><br>TENNECO AUTOMOTIVE OPERATING<br>COMPANY, INC.,<br>c/o Corporate Creations Network, Inc.,<br>Statutory Agent<br>119 E. Court Street<br>Cincinnati, Ohio 45202,<br><br>and<br><br>DRiV INCORPORATED<br>c/o Corporate Creations Network, Inc.,<br>Statutory Agent<br>119 E. Court Street<br>Cincinnati, Ohio 45202<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 22CV000133<br><br>Judge Robinson<br><br>**COMPLAINT FOR DAMAGES WITH**<br><u>**JURY DEMAND ENDORSED HEREON**</u><br><br>Nicholas T. Stack (0086333)<br>Thomas P. Dillon (0059899)<br>SHUMAKER, LOOP & KENDRICK, LLP<br>1000 Jackson Street<br>Toledo, Ohio  43604-5573<br>Telephone:   (419) 241-9000<br>Facsimile:    (419) 241-6894<br>E-mail:      nstack@shumaker.com<br>             tdillon@shumaker.com<br><br>Attorneys for MCS Manufacturing, LLC |

*     *     *

1

## NATURE OF ACTION

1.     This is an action to provide Plaintiff MCS Manufacturing, LLC ("MCS") a remedy for Defendants Tenneco, Inc., Tenneco Automotive Operating Company, Inc., and DRiV, Incorporated's (collectively, "Defendants") broken promises, misrepresentations, and pattern of coercion that crippled MCS's business.

2.     Tenneco is a publicly traded, Fortune 500 Company that, among other things, manufactures and distributes automotive components and original equipment, itself or through its subsidiaries and related entities, to major automobile manufacturers.  MCS is a small, Ohio employer based in Lyons, Ohio that provides custom assembly, tooling, and machining services, among other things.

3.     Beginning in 2008, MCS began working closely with Defendants' representatives in Napoleon, Ohio.  From Napoleon, Defendants engaged MCS on a wide array of projects.  Given MCS's close relationship with Defendants' Napoleon facility and representatives, MCS operated on decidedly slim profit margins to assist Defendants' Napoleon facility.

4.     Eventually, Defendants' Napoleon representatives committed to a specific multi-year, high-volume project related to the manufacture of struts for General Motors "K2XX" vehicle platform.  Specifically, Defendants engaged MCS to assemble top mounts, which were then included into Defendants' struts. The top mount program required significant investment by MCS, including the development of a patented system and method for the efficient assembly of top mounts. The top mount assembly project ran its course as agreed.

5.     In 2017, Defendants again engaged MCS to assemble top mounts – this time in relation to General Motors' next generation "T1XX" vehicle platform, which would eventually replace the K2XX platform.  In no uncertain terms, Defendants promised that the T1XX assembly

2

program awarded to MCS would last for six' years at an annual volume of 2 million pieces. Defendants also represented to MCS that General Motors provided no "tooling" money, so MCS would need to absorb all capital costs related to tooling and equipment. Defendants also acknowledged that the scope of the program would necessitate an expansion of MCS's physical plant to accommodate the award and additional volume.

6.   By 2018, MCS was fully invested in plant improvements and equipment to bring the T1XX top mount assembly project online. MCS was also working diligently with Defendants' engineers and other representatives to perfect the top mount assembly parts and process in coordination with Defendants' supply chain.

7.   At that time, with MCS over a proverbial barrel, Defendants' corporate representatives suddenly demanded concessions from MCS in the form of "rebates" for prior work. More specifically, in the summer of 2018, Defendants demanded a payment or credit totaling $100,000. With the understanding that failure to remit a credit could have a devastating effect on MCS's T1XX project, MCS relented and provided Defendants with a rebate credit for four quarters.

8.   Later in 2018, Defendants demanded that MCS complete the manufacture of all equipment for the T1XX top mount assembly project prior to that equipment being necessary for production. Despite their prior representations that General Motors had provided no "tooling" money for the project, Defendants' representatives stated that they were in the process of recovering and pocketing $130,000 from General Motors for MCS's capital outlays.

9.   In June 2019, just months after the T1XX project came online, Defendants suddenly threatened to strip MCS of all T1XX work and move the project to Defendants' own facility in Reynosa, Mexico. Defendants' purported justification for their threat was premised upon a vague reference to "tariffs."

3

10. Though delayed by COVID-19, Defendants eventually made good on their threat and stripped MCS of the T1XX program, in part, in October 2021 and completely by March 2022 with no compensation whatsoever for MCS.

11. Ultimately, Defendants made a long-term commitment to MCS, but instead used MCS as a Guinea pig to perfect the top mount parts and process and provide early supply to meet Defendants' commitments to General Motors. Defendants then reneged on their promises to MCS in bad faith and without justification, leaving MCS holding the bag for significant capital costs without the benefit of the Parties' bargain. This action is intended to remedy the resulting injustice.

## PARTIES

12. MCS is an Ohio limited liability company with its principal place of business in Fulton County, Ohio. MCS offers its customers a wide array of services with a focus on designing and building custom machinery and tooling. MCS also offers its customers several machine-based solutions to allow for the custom assembly of manufacturing components. MCS's sole member is Aaron Call who is an Ohio citizen and resident of Fulton County.

13. Tenneco, Inc. ("Tenneco") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Tenneco touts itself as one of the world's leading designers, manufacturers, and marketers of automotive products for original equipment and aftermarket customers. Tenneco has maintained and operated out of several Ohio facilities, including a facility in Napoleon, Ohio.

14. Tenneco Automotive Operating Company Inc. ("Tenneco Operating Company") is a Delaware corporation with its principal place of business in Lake Forest, Illinois and registered to do business in the State of Ohio. Tenneco Operating Company is a direct subsidiary of Tenneco that also designs and manufactures automotive systems and components.

4

Tenneco Operating Company has also maintained and operated out of several Ohio facilities, including a facility in Napoleon, Ohio.

15.     DRiV Incorporated ("DRiV") is a Delaware corporation with its principal place of business in Lake Forest, Illinois and registered to do business in the State of Ohio. DRiV is a subsidiary, affiliate, or division of Tenneco that manufactures and distributes original and aftermarket automobile parts.

16.     Tenneco, Tenneco Operating Company, and DRiV provide automobile components to several major automobile manufacturers, including General Motors, Ford, Stellantis, Daimler, and others.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over the Defendants pursuant to R.C. § 2307.382(A)(1), (A)(2), (A)(3), (A)(4), and/or (A)(6).

18.     Venue in this Court is proper pursuant to Civil Rule 3(C)(3), (C)(6), and/or (C)(12).

## RELEVANT FACTS

**A.     MCS's History and Business in Lyons, Ohio.**

19.     MCS was founded by Aaron Call ("Call") in Lyons, Ohio in 2008.

20.     MCS was the product of Call's prior machining experience and engineering knowledge, as well as his vision to bring the worlds of machine building and component assembly together under one roof.

21.     As MCS grew, it began offering cutting edge, cost-effective machining and assembly solutions to its customers. MCS has continued to provide cutting edge, cost-effective solutions to its customers through today.

5

**B.** **MCS's Early, Successful Relationship with Defendants Through Their Napoleon Facility**

22.    In mid-2008, MCS began working with Defendants through certain individuals located in Defendants' Napoleon facility ("Tenneco Napoleon").

23.    Defendants built and maintained their early business relationship with MCS exclusively through Defendants' representatives and managers at Tenneco Napoleon.

24.    MCS's first job for Defendants in 2008 was a welding project for the production of bushing inner tubes related to work at Tenneco Napoleon.  After that first job, Tenneco Napoleon began using MCS regularly for a wide variety of projects including, but not limited to, robot welding, re-work, assembly, sorting, and packaging.

25.    During the first several years of the Parties' relationship, MCS worked directly with and through individuals at Tenneco Napoleon to supplement Tenneco Napoleon's capabilities.

26.    Throughout this period, Tenneco Napoleon did not treat MCS as a traditional supplier, but rather as an extension of Tenneco Napoleon whereby MCS would operate on thin margins and not be included in supplier meetings.

27.    Additionally, Defendants' representatives from Tenneco Napoleon would provide certain equipment directly to MCS for use on Defendants' projects, monitor MCS's work directly through Tenneco Napoleon's quality department, and provide all production part approval process ("PPAP") documentation for MCS's work to Defendants' customers – something a traditional supplier would do itself.

28.    Upon information and belief, Tenneco Napoleon's representatives intended to work with and through MCS to take advantage of lower labor costs at MCS and, accordingly, increase Tenneco Napoleon's reported profit margins.

6

29. In 2013, General Motors ("GM") awarded Defendants a program to provide struts for use in GM's new "K2XX" vehicle platform that GM developed for its line of full-size trucks and SUVs.

30. Subsequently, representatives from Tenneco Napoleon approached and negotiated with MCS to provide a manufacturing and assembly solution for the top mounts that would be incorporated into Defendants' strut.

31. Defendants' Tenneco Napoleon representatives then committed to a seven-year program whereby MCS would assemble an average volume of 120,000 top mounts per month on behalf of Tenneco Napoleon.

32. In light of both the longevity and volume of Defendants' commitment, MCS made a considerable investment to expand its facility, purchase custom presses, tooling, and supporting equipment, and create a dedicated assembly line for the K2XX project.

33. Additionally, Call co-developed and patented a specific system and method for assembling top mounts.

34. MCS began assembling the top mounts for the K2XX program in 2013 and continued to produce the K2XX top mounts for over seven years, when the K2XX relationship ended as agreed.

**C.** **Defendants Negotiate with and Award MCS a Multi-Year Project for Assembly Work on GM's Next Generation Vehicle Platform – the T1XX – at Quoted Annual Volumes**

35. By 2015, GM had already developed its next generation vehicle platform – the T1XX – to replace the K2XX platform.

7

36.     Given MCS's success working on the K2XX program through Tenneco Napoleon, Defendants contacted MCS about top mount assembly work related to the T1XX program.

37.     On September 2, 2015, Dave Beggs ("Beggs"), one of Defendants' corporate representatives, reached out to Call and wrote that Defendants were "looking at options" for assembly prices to include in a bid for the T1XX top mount.

38.     Mr. Beggs wrote that Defendants had decided to give MCS "a shot" at quoting the related assembly work, noting that the "target is $.29" per piece and the "quoted volume is 2mm pcs per year."

39.     After considering certain T1XX top mount design changes, additional tooling needed, and the incorporation of an additional spring seat assembly into the assembly process, Call wrote to Beggs on September 15, 2015 and described what Call believed to be pricing for "the most effective solution."

40.     Specifically, MCS offered to take on the project at a cost of $0.49 per piece with Defendants providing $75,000 for tooling.  MCS also offered to "give back 2% a year" for the years remaining on the K2XX program.

41.     Subsequently, MCS and Defendants' representatives negotiated a lower $0.395 price per piece, with certain added capital costs absorbed by MCS based upon Defendants' representations that General Motors offered no tooling money for the project.

42.     Given the target price and capital expenditures that would be required by MCS, the profit margin that would be realized by MCS was slim.

43.     On July 12, 2016, Beggs wrote to Call acknowledging that Beggs received the "lower price" per piece, but reiterated that Defendants had no assembly "tooling dollars" for the

8

project. Beggs asked Call to "absorb" the tooling costs with no changes to the lower per piece price.

44.     Beggs confirmed that Defendants had been "awarded this business" and reiterated that it would be a "6 yr. program that starts in mid 2018."

45.     On July 14, 2016, Call responded and wrote that MCS "will figure out a way to make it work."

46.     During this time, Tom Weaver ("Weaver"), a representative from Tenneco Napoleon recognized the potential for eliminating "cross-docking" of product between Tenneco Napoleon and MCS and discussed with Call the need for MCS to build out additional dock and warehouse space to handle bulk components directly from China.

47.     On November 11, 2016, Tom Billerman ("Billerman"), another of Defendants' corporate representatives provided a breakdown of the annual volume and confirmed that the total annual volume at MCS for T1XX top mount assemblies would be 2,092,675 pieces per year.

48.     In December 2016, Defendants alerted MCS to new issues that would necessitate additional equipment and tooling.

49.     Specifically, Defendants revealed a design change in the T1XX program and, also, a need to maintain the K2XX assembly program while the T1XX ramped up. Both revelations added more capital costs related, in part, to the need to switch certain equipment between the two programs as they ran simultaneously. Accordingly, MCS asked for $40,000 in tooling costs.

9

50.     On December 15, 2016, Beggs responded reiterating that Defendants had "no tooling dollars" for the top mount assembly and needed "confirmation" that the price would remain $0.395 per piece.

51.     The same day, Call responded that the $0.395 assembly price per piece would remain the same, but again requested $40,000 in tooling reimbursement.

52.     Without a response from Beggs, Call reached out to one of Defendants' Tenneco Napoleon representatives, Jason Brown, who supported MCS's request for tooling dollars in the form of a $0.015 increase to the price per piece until the total amount covered $40,000.

53.     On January 4, 2017, Beggs responded. Beggs again stated that MCS was "to absorb all tooling to receive the business," which was moving to the United States "from China." Beggs refused to allow for any tooling costs and finished by writing, "This is a big piece of business for MCS that's supposed to run several years so let me know where you stand with this extra $40k as we have to make fast decisions for this ...."

54.     Ultimately, given Defendants' representations that GM offered no tooling money for the project and the longevity of the project, MCS agreed to absorb the associated tooling costs despite the already slim profit margin associated with the project.

55.     On January 25, 2017, Defendants formally awarded MCS the six-year, 2 million piece per year T1XX top mount assembly project at a $0.395 price per piece with MCS absorbing associated tooling costs ("Award").

56.     Specifically, Doug Steed ("Steed") wrote:

Pursuant to the award of the component(s) listed below to Tenneco. Tenneco has selected MCS as the supplier of these component(s). This selection is based on MCS quote response and all correspondence with regards to the component(s). Tooling PO(s) will be released shortly, if applicable. This email is to be used as the official kickoff for this part and time-table henceforth.

10

57. Steed identified two specific T1XX truck-related part numbers for assembly at a production cost of $0.395 per piece.

58. The e-mail included Steed's electronic signature and related contact information, which identified him as Defendants' "Applications / Program Buyer" for "Global Purchasing."

**D. MCS Makes Considerable Investments in Equipment and Facilities and Develops Assembly Design Solutions to Accommodate the T1XX Award**

59. After Defendants formally awarded MCS the six-year project, MCS immediately began making the investments necessary to support the project.

60. Within two weeks of the Award, MCS began working to develop, design, and purchase the necessary equipment, tooling, and assembly solutions.

61. Among other things, Call co-designed, manufactured, and patented a new system and method for the assembly of top mounts for the T1XX program.

62. Between the date of the Award and commencement of production, MCS invested hundreds of thousands of dollars in necessary tooling, machinery, and other equipment related to the T1XX program. For example, MCS upgraded its presses and purchased new assembly tooling with spares, a tow motor, two new spring seat machines, new dumpers, ovens, a new hydraulic cylinder, and several additional pieces of equipment.

63. To accommodate the Award, and as discussed with Tenneco Napoleon's representatives, MCS also invested significant amounts to expand its Lyons, Ohio facility.

64. Specifically, MCS invested over $650,000 to build additional warehouse space, docking space, and shop floor space in a 10,000 sq. ft. expansion.

65. MCS committed to the expansion of its facility in 2017 and broke ground during the spring of 2018.

11

66.     The need to expand and invest in the facility to accommodate the Award was well-known to and, in fact, expected by Defendants' representatives.

67.     Not only did Weaver inquire about expansion during the negotiation process, but also Billerman inquired about MCS's expansion plans for warehouse and dock space at or about the time of the Award.

68.     Subsequently, Call kept the individuals at Tenneco Napoleon apprised of the progress with the expansion and buildout process.

### E.     MCS Prepares for Production and Defendants Commit to Additional Top Mount Assembly Volume for GM SUVs

69.     In addition to the substantial capital investments MCS committed to the T1XX program in 2017 and 2018, MCS also invested a significant amount of time and effort working closely with Defendants to test and make adjustments to the top mount assembly prior to its incorporation into the strut supply chain.

70.     MCS actively worked with Defendants so that Defendants could demonstrate to GM that their struts satisfied the PPAP and warrant to GM that the struts could be manufactured consistently in accordance with GM's requirements.

71.     Among other things, MCS discovered that certain plastic bushings provided to MCS for incorporation into the top mounts were cracking and breaking during the assembly process.  To remedy the issue and ensure the assembled top mounts met quality specifications, MCS invested in several compact ovens to ensure the integrity of the components.  The new ovens required additional labor costs for operating the ovens and additional capital costs for the ovens themselves and related equipment.

72.     In response to Defendants' unilateral alteration of packing materials during launch, MCS was also compelled to add an additional operator to handle the modifications.

12

73. In addition, MCS coordinated with Defendants' other facilities, including a facility in Reynosa, Mexico, to provide samples and hone issues related to quality control, timing, and shipping.

74. Notably, throughout this preparation process, Defendants consistently grouped MCS with Tenneco Napoleon and referred to MCS in product-related correspondence as "MCS/Napoleon."

75. In early 2018, and prior to mass production coming online, Defendants approached MCS to add additional volume to the T1XX program. The additional volume would add top mount assembly volume related to front and rear struts destined for GM's SUVs.

76. On May 2, 2018, Call informed Defendants that the increased volume would require additional equipment to avoid over-scheduling the equipment already committed to production of top mount assemblies related to GM's full-sized trucks.

77. The same day, Bryan Jones, Defendants' corporate senior program manager in charge of the T1XX SUV launch, responded and provided increased volume breakdowns that incorporated the SUV pieces.

78. Also on May 2, 2018, Call discussed SUV front and rear top mount timelines with Defendants' representatives.

79. On May 30, 2018, Call followed up with Steed to get confirmation as to whether "MCS is a go" on the SUV program as "[l]aunch meetings" had begun for the SUV top mount.

80. On October 2, 2018, Steed confirmed in writing that "MCS will soon receive the award for the T1XX SUV Front assembly work. Can you forward your timing?"

13

81.     However, rather than award MCS both the front and rear strut top mount assemblies, as previously discussed, Steed added that the "rear is going to be assembled in Mexico."

82.     Defendants' representatives confirmed to MCS that the additional SUV volume would last for the same six-year duration as the committed truck program.

83.     Accordingly, MCS committed approximately $425,000 in additional capital to purchase additional equipment and upgrade other services related exclusively to the SUV volume.

**F.      With MCS Fully Invested in the T1XX Program, Defendants' Corporate Representatives Coerce MCS to Make Concessions to Maintain Its Relationship with Defendants**

84.     During the spring and summer of 2018, MCS was fully invested in and committed to production of top mount assemblies for the T1XX program related to GM's full-sized trucks.

85.     Although Defendants had not yet begun full-scale production for the T1XX truck program, MCS was immersed in preparations to bring the top mount assembly process online and to integrate that process with Defendants' supply chain.

86.     MCS was also fully engaged in bringing the T1XX top mount assembly program for GM's SUVs online.

87.     With the foregoing preparations in full swing, Ruth Burdine ("Burdine"), Defendants' "Sr. Commodity Buyer," unexpectedly reached out to Call for the purpose of discussing "a rebate on the business we are doing with MCS."

88.     Eventually, on or about July 18, 2018, Call met with Burdine and Gleidson Lima, a Tenneco commodity buyer from Tenneco Automotive Brazil Ltda., at Defendants' office in Monroe, Michigan.

14

89.     During that meeting, Burdine demanded MCS give Defendants a productivity "rebate" related to the work MCS previously performed for Defendants over the prior three years.

90.     Specifically, Burdine demanded MCS pay Defendants $100,000 and stated that it would be in MCS's "best interests" to comply with her demand.

91.     Given the nature and tone of the meeting, Call understood Burdine's demand for payment may have serious ramifications on MCS's significant investments in the T1XX program.

92.     Moreover, as Defendants had never treated MCS as a traditional supplier, but rather as an extension of Tenneco Napoleon, MCS operated with significantly reduced profit margins than traditional suppliers. Accordingly, MCS could not commit to a $100,000 payment for prior work.

93.     On July 30, 2018, Call responded to Burdine's demand and, in lieu of making a monetary commitment, documented several significant monetary expenses that MCS had absorbed to accommodate Defendants, which totaled over $1M.

94.     Among other things, Call explained that MCS agreed to reduce the T1XX top mount assembly cost from K2XX, pay for new machines, pay tooling costs associated with the T1XX program, and pay for several new machines necessary to handle T1XX design and engineering changes without the benefit of any tooling reimbursements.

95.     Call also noted that Defendants had also extended its payment term, which caused MCS to absorb $100,000.00 in receivables.

15

96.     In response, Burdine chastised Call and stated, "It is not acceptable for you to say you do not agree to pay productivity. I suggest you review this again and come back with productivity."

97.     Eventually, Call relented and offered $3,750 per quarter for four quarters to satisfy the demand.

98.     Burdine responded and demanded MCS "come up closer to $15,000 per quarter."

99.     Call then increased the offer to $5,600.00, explaining that amount was "all we can commit to."

100.    Burdine responded, "Send a credit this week" and MCS complied.

101.    Toward the end of 2018, MCS was also working to complete the tooling and equipment associated with the T1XX program.

102.    On October 22, 2018, even though the K2XX program was still running and the T1XX program had not yet come online, Defendants demanded that MCS quickly complete all four T1XX assembly tools.

103.    Although all four tools would not be needed until mid-2019, Defendants stated that they had "$130,000 in tooling recovery held up" because all four tools from MCS had not yet been completed.

104.    Defendants' revelation about tooling dollars from GM associated with the top mount assemblies surprised MCS, as Defendants had consistently represented that no tooling money had been allowed, compelling MCS to absorb those costs.

105.    Nevertheless, MCS worked to get an additional tool built by the end of 2018 and the remaining tools built in early 2019, so Defendants could recoup and pocket $130,000 for tooling costs related to tooling paid for by MCS.

### G. MCS Commences Production on the T1XX Top Mount Assemblies and Defendants Threaten to Strip MCS of the T1XX Program

106. In January 2019, MCS began ramping up production on top mount assemblies for the T1XX program while still producing top mount assemblies for Defendants with respect to the K2XX program.

107. In May 2019, MCS began full production for the T1XX program.

108. In early June 2019, Burdine unexpectedly reached out to Call once again and requested a meeting.

109. On or about June 21, 2019, Burdine informed Call that Defendants may strip MCS of the T1XX program and move all top mount assemblies for GM trucks and SUVs to Defendants' Reynosa, Mexico facility.

110. On June 24, 2019, Burdine asked for a quote related to MCS's T1XX capital "in the event our conversation with our customer gets to this level."

111. On July 17, 2019, Call responded on behalf of MCS by letter and reiterated the commitment Defendants made to MCS, the capital equipment expenditures MCS made to perform its own commitments, the physical expansion costs necessitated by the program, and the patented process developed by MCS for top mount assemblies.

112. While MCS expressed its desire for Defendants to honor their existing contractual relationship, MCS provided monetary figures related to MCS's equipment costs, expansion costs, and patent royalties.

113. By February 2020, Defendants had not resolved their June 2019 threat to move the T1XX top mounts assembly project to Reynosa, Mexico and MCS continued to produce top mount assemblies, as promised.

17

114.    Accordingly, MCS engaged legal representation to obtain clarity with respect to Defendants' intentions; however, no such clarity materialized and soon thereafter, the nation was struck by various shutdowns due to COVID-19.

115.    MCS continued to provide top mount assemblies for the T1XX program throughout 2020.

116.    On February 24, 2021, Jim Braddock, Defendants' Director of Global Purchasing, sent MCS an e-mail containing a purported six-month termination notice related to all T1XX top mount assembly pieces produced for Defendants by MCS.

117.    Despite the purported six-month notice, MCS continued to produce T1XX top mount assemblies for Defendants through October 22, 2021 (for GM trucks) and March 15, 2022 for GM SUVs, at which time Defendants ceased using MCS for T1XX production.

118.    Upon information and belief, Defendants have been assembling top mounts for the T1XX program at their facility in Reynosa, Mexico.

### COUNT ONE
### (Breach of Contract – U.C.C.)

119.    MCS incorporates all prior allegations as if fully restated herein.

120.    MCS is a "seller" pursuant to R.C. § 1302.01(A)(4).

121.    Defendants are "buyers" pursuant to R.C. § 1302.01(A)(1).

122.    MCS and Defendants had a valid and enforceable "contract" pursuant to R.C. § 1302.01(A)(11) whereby Defendants promised to pay MCS for "goods" – 2 million T1XX top mount assemblies for GM trucks annually for six years at a cost of $0.395 per unit.

123.    MCS and Defendants had a valid and enforceable "contract" pursuant to R.C. § 1302.01(A)(11) whereby Defendants promised to pay MCS for additional "goods" – 680,000 T1XX top mount assemblies for GM SUVs annually for six years at a cost of $0.395 per unit.

18

124.    Defendants had an obligation to act in good faith with respect to their performance under the contracts.

125.    MCS has fully and satisfactorily performed all of its agreed-upon obligations under the contracts and has at all relevant times remained willing and able to proceed under the contracts.

126.    Defendants have materially breached the contracts through an anticipatory repudiation and/or terminating the contracts prior to the end of the six-year terms and failing to meet volume commitments.

127.    Defendants have failed or refused to perform their obligations under the contracts in good faith.

128.    As a direct and proximate cause of Defendants' material breaches, MCS has suffered direct, incidental, and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT TWO
### (Breach of Contract – Common Law)

129.    MCS incorporates all prior allegations as if fully restated herein.

130.    Alternatively, MCS and Defendants had a valid and enforceable common law agreement whereby Defendants promised to pay MCS to assemble 2 million T1XX top mount assemblies for GM trucks annually for six years at a cost of $0.395 per unit.

131.    Alternatively, MCS and Defendants had a valid and enforceable common law agreement whereby Defendants promised to pay MCS to assemble an additional 680,000 T1XX top mount assemblies for GM SUVs annually for six years at a cost of $0.395 per unit.

132.    MCS has fully and satisfactorily performed all of its agreed upon obligations.

19

133. Defendants have materially breached the agreements by terminating the agreements prior to the end of the six-year term and failing to meet their volume commitments.

134. As a direct and proximate cause of Defendants' material breaches, MCS has suffered direct and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT THREE
### (Promissory Estoppel)

135. MCS incorporates all prior allegations as if fully restated herein.

136. During the course of their relationship with MCS, Defendants made numerous express and implied promises to MCS.

137. MCS justifiably relied upon Defendants' promises to MCS's detriment.

138. As a direct and proximate cause of Defendants' broken promises, MCS has suffered direct, incidental, and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT FOUR
### (Fraudulent Inducement)

139. MCS incorporates all prior allegations as if fully restated herein.

140. During the course of their relationship with MCS, Defendants made material representations to MCS regarding the volume and duration of the T1XX top mount assembly project.

141. Defendants made those representations for the purpose of inducing MCS to make significant capital expenditures and provide Defendants with products, so Defendants could meet their own third-party commitments.

142. Upon information and belief, Defendants made those representations without any intention to honor their express promises.

143. Defendants also made material representations regarding the availability of "tooling" dollars from General Motors in relation to the capital costs necessary to bring the top mount assembly process online.

144. Defendants made those representations for the purpose of inducing MCS to make significant capital expenditures on tooling without compensation.

145. MCS justifiably relied upon Defendants' material representations.

146. As a direct and proximate result of Defendants' misrepresentations, MCS has been damaged in an amount in excess of $2.5MM, plus interest, costs, expenses, reasonable attorneys' fees, and punitive damages.

WHEREFORE, Plaintiff MCS requests that this Court enter judgment in favor of MCS and against Defendants for:

A. Compensatory damages in an amount in excess of $2.5MM for such sums as will compensate MCS for the injuries alleged herein;

B. Interest, costs, expenses, and reasonable attorneys' fees;

C. Punitive damages; and

D. Such other relief that the Court deems just and equitable.

Nicholas T. Stack
Thomas P. Dillon
SHUMAKER, LOOP & KENDRICK, LLP
Attorneys for MCS Manufacturing, LLC

## **JURY DEMAND**

MCS Manufacturing, LLC demands trial by jury on all issues so triable.

Nicholas T. Stack
Thomas P. Dillon
SHUMAKER, LOOP & KENDRICK, LLP

22

AUG 1 2 2022



**CORPORATE CREATIONS®**
Registered Agent • Director • Incorporation

**Corporate Creations Network Inc.**
801 US Highway 1 North Palm Beach, FL 33408

DRiV Incorporated                                                    08/15/2022
Alicia Ng
DRiV
7450 N. McCormick Blvd
Skokie IL 60045

# SERVICE OF PROCESS NOTICE

The following is a courtesy summary of the enclosed document(s).  **ALL information should be verified by you.**

Item: 2022-437

Note: Any questions regarding the substance of the matter described below, including the status or how to respond, should be directed to the contact set forth in line 12 below or to the court or government agency where the matter is being heard. IMPORTANT: All changes or updates to the SOP contact individuals or their contact information must be submitted in writing to SOPcontact@corpcreations.com. Any changes will become effective upon written confirmation of Corporate Creations.

| | | |
|---|---|---|
| 1. | **Entity Served:** | DRiV Incorporated |
| 2. | **Title of Action:** | MCS Manufacturing LLC vs. Tenneco Inc. |
| 3. | **Document(s) Served:** | Summons on Complaint<br>Complaint for Damages with Jury Demand Endorsed Hereon |
| 4. | **Court/Agency:** | Fulton County Common Pleas Court |
| 5. | **State Served:** | Ohio |
| 6. | **Case Number:** | 22CV000133 |
| 7. | **Case Type:** | Breach of Contract - U.C.C. |
| 8. | **Method of Service:** | Certified Mail |
| 9. | **Date Received:** | Friday 08/12/2022 |
| 10. | **Date to Client:** | Monday 08/15/2022 |
| 11. | **# Days When Answer Due:**<br>**Answer Due Date:** | 28<br>Friday 09/09/2022    CAUTION: Client is solely responsible for verifying the accuracy of the estimated Answer Due Date. To avoid missing a crucial deadline, we recommend immediately confirming in writing with opposing counsel that the date of the service in their records matches the Date Received. |
| 12. | **Sop Sender:**<br>(Name, City, State, and Phone Number) | Shumaker, Look & Kendrick, LLC<br>Toledo, OH<br>419-241-9000 |
| 13. | **Shipped To Client By:** | Email Only with PDF Link |
| 14. | **Tracking Number:** | |
| 15. | **Handled By:** | 361 |
| 16. | **Notes:** | None |

NOTE: This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information.  At Corporate Creations, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process.  To decrease risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective.  It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by Corporate Creations Network Inc.

## In The Court of Common Pleas
## Fulton County, Ohio

| | | |
|---|---|---|
| MCS MANUFACTURING LLC | : | **Case No. 22CV000133** |
| PLAINTIFF | : | |
| **Vs.** | : | Judge Jeffrey L. Robinson |
| **TENNECO INC** | : | |
| DEFENDANT | : | **SUMMONS ON COMPLAINT** |

TO:   **DRIV INCORPORATED**
      **C/O CORPORATE CREATIONS NETWORK INC S/A**
      **119 E COURT STREET**
      **CINCINNATI, OH   45202**

YOU ARE HEREBY SUMMONED that a complaint (a copy of which is hereby attached and made a part hereof) has been filed against you in this court by the Plaintiff(s) named herein.

You are required to serve upon the Plaintiff(s)attorney, or the Plaintiff if the plaintiff has no attorney of record, a copy of your answer to the complaint within *twenty eight (28)* days after service of this summons upon you, exclusive of the day of service.  Said answer must be filed with this court within *three (3)* days after service on the Plaintiff(s) attorney.  The address of the *Clerk of the Fulton County Court of Common Pleas is Room 102, Courthouse, 210  S. Fulton Street, Wauseon, Ohio   43567*.

The name and address of the Plaintiff(s) Attorney is as follows:
      NICHOLAS T STACK
      1000 JACKSON STREET
      TOLEDO, OH 43604-5573

If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

Tracy L. Zuver
Fulton County Clerk of
Common Pleas Court

August 8, 2022

*Selma Ruiz*

Deputy Clerk of Courts

FILED
FULTON COUNTY
COMMON PLEAS COURT

2022 AUG -8 AM 10: 12

TRACY L. ZUVER
CLERK

## IN THE COURT OF COMMON PLEAS
## FULTON COUNTY, OHIO

| | |
|---|---|
| MCS MANUFACTURING, LLC, <br> 15210 County Rd. 10-3 <br> Lyons, Ohio 43533, <br><br>      Plaintiff, <br><br> -vs- <br><br> TENNECO, INC., <br> c/o The Corporation Trust Company <br> Corporation Trust Center <br> 1209 Orange Street <br> Wilmington, Delaware 19801 <br><br> and <br><br> TENNECO AUTOMOTIVE OPERATING <br> COMPANY, INC., <br> c/o Corporate Creations Network, Inc., <br> Statutory Agent <br> 119 E. Court Street <br> Cincinnati, Ohio 45202, <br><br> and <br><br> DRiV INCORPORATED <br> c/o Corporate Creations Network, Inc., <br> Statutory Agent <br> 119 E. Court Street <br> Cincinnati, Ohio 45202 <br><br>      Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 22CV000133 <br><br> Judge Robinson <br><br> **COMPLAINT FOR DAMAGES WITH** <br> **JURY DEMAND ENDORSED HEREON** <br><br> Nicholas T. Stack (0086333) <br> Thomas P. Dillon (0059899) <br> SHUMAKER, LOOP & KENDRICK, LLP <br> 1000 Jackson Street <br> Toledo, Ohio  43604-5573 <br> Telephone:  (419) 241-9000 <br> Facsimile:  (419) 241-6894 <br> E-mail:    nstack@shumaker.com <br>              tdillon@shumaker.com <br><br> Attorneys for MCS Manufacturing, LLC |

                    *      *      *

## NATURE OF ACTION

1.      This is an action to provide Plaintiff MCS Manufacturing, LLC ("MCS") a remedy for Defendants Tenneco, Inc., Tenneco Automotive Operating Company, Inc., and DRiV, Incorporated's (collectively, "Defendants") broken promises, misrepresentations, and pattern of coercion that crippled MCS's business.

2.      Tenneco is a publicly traded, Fortune 500 Company that, among other things, manufactures and distributes automotive components and original equipment, itself or through its subsidiaries and related entities, to major automobile manufacturers.  MCS is a small, Ohio employer based in Lyons, Ohio that provides custom assembly, tooling, and machining services, among other things.

3.      Beginning in 2008, MCS began working closely with Defendants' representatives in Napoleon, Ohio.  From Napoleon, Defendants engaged MCS on a wide array of projects.  Given MCS's close relationship with Defendants' Napoleon facility and representatives, MCS operated on decidedly slim profit margins to assist Defendants' Napoleon facility.

4.      Eventually, Defendants' Napoleon representatives committed to a specific multi-year, high-volume project related to the manufacture of struts for General Motors "K2XX" vehicle platform.   Specifically, Defendants engaged MCS to assemble top mounts, which were then included into Defendants' struts. The top mount program required significant investment by MCS, including the development of a patented system and method for the efficient assembly of top mounts. The top mount assembly project ran its course as agreed.

5.      In 2017, Defendants again engaged MCS to assemble top mounts – this time in relation to General Motors' next generation "T1XX" vehicle platform, which would eventually replace the K2XX platform. In no uncertain terms, Defendants promised that the T1XX assembly

2

program awarded to MCS would last for six years at an annual volume of 2 million pieces. Defendants also represented to MCS that General Motors provided no "tooling" money, so MCS would need to absorb all capital costs related to tooling and equipment. Defendants also acknowledged that the scope of the program would necessitate an expansion of MCS's physical plant to accommodate the award and additional volume.

6.     By 2018, MCS was fully invested in plant improvements and equipment to bring the T1XX top mount assembly project online. MCS was also working diligently with Defendants' engineers and other representatives to perfect the top mount assembly parts and process in coordination with Defendants' supply chain.

7.     At that time, with MCS over a proverbial barrel, Defendants' corporate representatives suddenly demanded concessions from MCS in the form of "rebates" for prior work. More specifically, in the summer of 2018, Defendants demanded a payment or credit totaling $100,000. With the understanding that failure to remit a credit could have a devastating effect on MCS's T1XX project, MCS relented and provided Defendants with a rebate credit for four quarters.

8.     Later in 2018, Defendants demanded that MCS complete the manufacture of all equipment for the T1XX top mount assembly project prior to that equipment being necessary for production. Despite their prior representations that General Motors had provided no "tooling" money for the project, Defendants' representatives stated that they were in the process of recovering and pocketing $130,000 from General Motors for MCS's capital outlays.

9.     In June 2019, just months after the T1XX project came online, Defendants suddenly threatened to strip MCS of all T1XX work and move the project to Defendants' own facility in Reynosa, Mexico. Defendants' purported justification for their threat was premised upon a vague reference to "tariffs."

3

10.     Though delayed by COVID-19, Defendants eventually made good on their threat and stripped MCS of the T1XX program, in part, in October 2021 and completely by March 2022 with no compensation whatsoever for MCS.

11.     Ultimately, Defendants made a long-term commitment to MCS, but instead used MCS as a Guinea pig to perfect the top mount parts and process and provide early supply to meet Defendants' commitments to General Motors. Defendants then reneged on their promises to MCS in bad faith and without justification, leaving MCS holding the bag for significant capital costs without the benefit of the Parties' bargain. This action is intended to remedy the resulting injustice.

## PARTIES

12.     MCS is an Ohio limited liability company with its principal place of business in Fulton County, Ohio. MCS offers its customers a wide array of services with a focus on designing and building custom machinery and tooling. MCS also offers its customers several machine-based solutions to allow for the custom assembly of manufacturing components. MCS's sole member is Aaron Call who is an Ohio citizen and resident of Fulton County.

13.     Tenneco, Inc. ("Tenneco") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Tenneco touts itself as one of the world's leading designers, manufacturers, and marketers of automotive products for original equipment and aftermarket customers. Tenneco has maintained and operated out of several Ohio facilities, including a facility in Napoleon, Ohio.

14.     Tenneco Automotive Operating Company Inc. ("Tenneco Operating Company") is a Delaware corporation with its principal place of business in Lake Forest, Illinois and registered to do business in the State of Ohio. Tenneco Operating Company is a direct subsidiary of Tenneco that also designs and manufactures automotive systems and components.

4

Tenneco Operating Company has also maintained and operated out of several Ohio facilities, including a facility in Napoleon, Ohio.

15.     DRiV Incorporated ("DRiV") is a Delaware corporation with its principal place of business in Lake Forest, Illinois and registered to do business in the State of Ohio. DRiV is a subsidiary, affiliate, or division of Tenneco that manufactures and distributes original and aftermarket automobile parts.

16.     Tenneco, Tenneco Operating Company, and DRiV provide automobile components to several major automobile manufacturers, including General Motors, Ford, Stellantis, Daimler, and others.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over the Defendants pursuant to R.C. § 2307.382(A)(1), (A)(2), (A)(3), (A)(4), and/or (A)(6).

18.     Venue in this Court is proper pursuant to Civil Rule 3(C)(3), (C)(6), and/or (C)(12).

## RELEVANT FACTS

A.     **MCS's History and Business in Lyons, Ohio.**

19.     MCS was founded by Aaron Call ("Call") in Lyons, Ohio in 2008.

20.     MCS was the product of Call's prior machining experience and engineering knowledge, as well as his vision to bring the worlds of machine building and component assembly together under one roof.

21.     As MCS grew, it began offering cutting edge, cost-effective machining and assembly solutions to its customers. MCS has continued to provide cutting edge, cost-effective solutions to its customers through today.

5

**B.**    **MCS's Early, Successful Relationship with Defendants Through Their Napoleon Facility**

22.    In mid-2008, MCS began working with Defendants through certain individuals located in Defendants' Napoleon facility ("Tenneco Napoleon").

23.    Defendants built and maintained their early business relationship with MCS exclusively through Defendants' representatives and managers at Tenneco Napoleon.

24.    MCS's first job for Defendants in 2008 was a welding project for the production of bushing inner tubes related to work at Tenneco Napoleon.  After that first job, Tenneco Napoleon began using MCS regularly for a wide variety of projects including, but not limited to, robot welding, re-work, assembly, sorting, and packaging.

25.    During the first several years of the Parties' relationship, MCS worked directly with and through individuals at Tenneco Napoleon to supplement Tenneco Napoleon's capabilities.

26.    Throughout this period, Tenneco Napoleon did not treat MCS as a traditional supplier, but rather as an extension of Tenneco Napoleon whereby MCS would operate on thin margins and not be included in supplier meetings.

27.    Additionally, Defendants' representatives from Tenneco Napoleon would provide certain equipment directly to MCS for use on Defendants' projects, monitor MCS's work directly through Tenneco Napoleon's quality department, and provide all production part approval process ("PPAP") documentation for MCS's work to Defendants' customers – something a traditional supplier would do itself.

28.    Upon information and belief, Tenneco Napoleon's representatives intended to work with and through MCS to take advantage of lower labor costs at MCS and, accordingly, increase Tenneco Napoleon's reported profit margins.

6

29.     In 2013, General Motors ("GM") awarded Defendants a program to provide struts for use in GM's new "K2XX" vehicle platform that GM developed for its line of full-size trucks and SUVs.

30.     Subsequently, representatives from Tenneco Napoleon approached and negotiated with MCS to provide a manufacturing and assembly solution for the top mounts that would be incorporated into Defendants' strut.

31.     Defendants' Tenneco Napoleon representatives then committed to a seven-year program whereby MCS would assemble an average volume of 120,000 top mounts per month on behalf of Tenneco Napoleon.

32.     In light of both the longevity and volume of Defendants' commitment, MCS made a considerable investment to expand its facility, purchase custom presses, tooling, and supporting equipment, and create a dedicated assembly line for the K2XX project.

33.     Additionally, Call co-developed and patented a specific system and method for assembling top mounts.

34.     MCS began assembling the top mounts for the K2XX program in 2013 and continued to produce the K2XX top mounts for over seven years, when the K2XX relationship ended as agreed.

**C.      Defendants Negotiate with and Award MCS a Multi-Year Project for Assembly Work on GM's Next Generation Vehicle Platform – the T1XX – at Quoted Annual Volumes**

35.     By 2015, GM had already developed its next generation vehicle platform – the T1XX – to replace the K2XX platform.

7

36.    Given MCS's success working on the K2XX program through Tenneco Napoleon, Defendants contacted MCS about top mount assembly work related to the T1XX program.

37.    On September 2, 2015, Dave Beggs ("Beggs"), one of Defendants' corporate representatives, reached out to Call and wrote that Defendants were "looking at options" for assembly prices to include in a bid for the T1XX top mount.

38.    Mr. Beggs wrote that Defendants had decided to give MCS "a shot" at quoting the related assembly work, noting that the "target is $.29" per piece and the "quoted volume is 2mm pcs per year."

39.    After considering certain T1XX top mount design changes, additional tooling needed, and the incorporation of an additional spring seat assembly into the assembly process, Call wrote to Beggs on September 15, 2015 and described what Call believed to be pricing for "the most effective solution."

40.    Specifically, MCS offered to take on the project at a cost of $0.49 per piece with Defendants providing $75,000 for tooling.  MCS also offered to "give back 2% a year" for the years remaining on the K2XX program.

41.    Subsequently, MCS and Defendants' representatives negotiated a lower $0.395 price per piece, with certain added capital costs absorbed by MCS based upon Defendants' representations that General Motors offered no tooling money for the project.

42.    Given the target price and capital expenditures that would be required by MCS, the profit margin that would be realized by MCS was slim.

43.    On July 12, 2016, Beggs wrote to Call acknowledging that Beggs received the "lower price" per piece, but reiterated that Defendants had no assembly "tooling dollars" for the

8

project. Beggs asked Call to "absorb" the tooling costs with no changes to the lower per piece price.

44.    Beggs confirmed that Defendants had been "awarded this business" and reiterated that it would be a "6 yr. program that starts in mid 2018."

45.    On July 14, 2016, Call responded and wrote that MCS "will figure out a way to make it work."

46.    During this time, Tom Weaver ("Weaver"), a representative from Tenneco Napoleon recognized the potential for eliminating "cross-docking" of product between Tenneco Napoleon and MCS and discussed with Call the need for MCS to build out additional dock and warehouse space to handle bulk components directly from China.

47.    On November 11, 2016, Tom Billerman ("Billerman"), another of Defendants' corporate representatives provided a breakdown of the annual volume and confirmed that the total annual volume at MCS for T1XX top mount assemblies would be 2,092,675 pieces per year.

48.    In December 2016, Defendants alerted MCS to new issues that would necessitate additional equipment and tooling.

49.    Specifically, Defendants revealed a design change in the T1XX program and, also, a need to maintain the K2XX assembly program while the T1XX ramped up. Both revelations added more capital costs related, in part, to the need to switch certain equipment between the two programs as they ran simultaneously. Accordingly, MCS asked for $40,000 in tooling costs.

9

50.     On December 15, 2016, Beggs responded reiterating that Defendants had "no tooling dollars" for the top mount assembly and needed "confirmation" that the price would remain $0.395 per piece.

51.     The same day, Call responded that the $0.395 assembly price per piece would remain the same, but again requested $40,000 in tooling reimbursement.

52.     Without a response from Beggs, Call reached out to one of Defendants' Tenneco Napoleon representatives, Jason Brown, who supported MCS's request for tooling dollars in the form of a $0.015 increase to the price per piece until the total amount covered $40,000.

53.     On January 4, 2017, Beggs responded.  Beggs again stated that MCS was "to absorb all tooling to receive the business," which was moving to the United States "from China." Beggs refused to allow for any tooling costs and finished by writing, "This is a big piece of business for MCS that's supposed to run several years so let me know where you stand with this extra $40k as we have to make fast decisions for this ...."

54.     Ultimately, given Defendants' representations that GM offered no tooling money for the project and the longevity of the project, MCS agreed to absorb the associated tooling costs despite the already slim profit margin associated with the project.

55.     On January 25, 2017, Defendants formally awarded MCS the six-year, 2 million piece per year T1XX top mount assembly project at a $0.395 price per piece with MCS absorbing associated tooling costs ("Award").

56.     Specifically, Doug Steed ("Steed") wrote:

Pursuant to the award of the component(s) listed below to Tenneco. Tenneco has selected MCS as the supplier of these component(s). This selection is based on MCS quote response and all correspondence with regards to the component(s). Tooling PO(s) will be released shortly, if applicable. This email is to be used as the official kickoff for this part and time-table henceforth.

10

57. Steed identified two specific T1XX truck-related part numbers for assembly at a production cost of $0.395 per piece.

58. The e-mail included Steed's electronic signature and related contact information, which identified him as Defendants' "Applications / Program Buyer" for "Global Purchasing."

### D. MCS Makes Considerable Investments in Equipment and Facilities and Develops Assembly Design Solutions to Accommodate the T1XX Award

59. After Defendants formally awarded MCS the six-year project, MCS immediately began making the investments necessary to support the project.

60. Within two weeks of the Award, MCS began working to develop, design, and purchase the necessary equipment, tooling, and assembly solutions.

61. Among other things, Call co-designed, manufactured, and patented a new system and method for the assembly of top mounts for the T1XX program.

62. Between the date of the Award and commencement of production, MCS invested hundreds of thousands of dollars in necessary tooling, machinery, and other equipment related to the T1XX program. For example, MCS upgraded its presses and purchased new assembly tooling with spares, a tow motor, two new spring seat machines, new dumpers, ovens, a new hydraulic cylinder, and several additional pieces of equipment.

63. To accommodate the Award, and as discussed with Tenneco Napoleon's representatives, MCS also invested significant amounts to expand its Lyons, Ohio facility.

64. Specifically, MCS invested over $650,000 to build additional warehouse space, docking space, and shop floor space in a 10,000 sq. ft. expansion.

65. MCS committed to the expansion of its facility in 2017 and broke ground during the spring of 2018.

11

66.     The need to expand and invest in the facility to accommodate the Award was well-known to and, in fact, expected by Defendants' representatives.

67.     Not only did Weaver inquire about expansion during the negotiation process, but also Billerman inquired about MCS's expansion plans for warehouse and dock space at or about the time of the Award.

68.     Subsequently, Call kept the individuals at Tenneco Napoleon apprised of the progress with the expansion and buildout process.

### E.     MCS Prepares for Production and Defendants Commit to Additional Top Mount Assembly Volume for GM SUVs

69.     In addition to the substantial capital investments MCS committed to the T1XX program in 2017 and 2018, MCS also invested a significant amount of time and effort working closely with Defendants to test and make adjustments to the top mount assembly prior to its incorporation into the strut supply chain.

70.     MCS actively worked with Defendants so that Defendants could demonstrate to GM that their struts satisfied the PPAP and warrant to GM that the struts could be manufactured consistently in accordance with GM's requirements.

71.     Among other things, MCS discovered that certain plastic bushings provided to MCS for incorporation into the top mounts were cracking and breaking during the assembly process.  To remedy the issue and ensure the assembled top mounts met quality specifications, MCS invested in several compact ovens to ensure the integrity of the components.  The new ovens required additional labor costs for operating the ovens and additional capital costs for the ovens themselves and related equipment.

72.     In response to Defendants' unilateral alteration of packing materials during launch, MCS was also compelled to add an additional operator to handle the modifications.

12

73.    In addition, MCS coordinated with Defendants' other facilities, including a facility in Reynosa, Mexico, to provide samples and hone issues related to quality control, timing, and shipping.

74.    Notably, throughout this preparation process, Defendants consistently grouped MCS with Tenneco Napoleon and referred to MCS in product-related correspondence as "MCS/Napoleon."

75.    In early 2018, and prior to mass production coming online, Defendants approached MCS to add additional volume to the T1XX program. The additional volume would add top mount assembly volume related to front and rear struts destined for GM's SUVs.

76.    On May 2, 2018, Call informed Defendants that the increased volume would require additional equipment to avoid over-scheduling the equipment already committed to production of top mount assemblies related to GM's full-sized trucks.

77.    The same day, Bryan Jones, Defendants' corporate senior program manager in charge of the T1XX SUV launch, responded and provided increased volume breakdowns that incorporated the SUV pieces.

78.    Also on May 2, 2018, Call discussed SUV front and rear top mount timelines with Defendants' representatives.

79.    On May 30, 2018, Call followed up with Steed to get confirmation as to whether "MCS is a go" on the SUV program as "[l]aunch meetings" had begun for the SUV top mount.

80.    On October 2, 2018, Steed confirmed in writing that "MCS will soon receive the award for the T1XX SUV Front assembly work. Can you forward your timing?"

13

81.     However, rather than award MCS both the front and rear strut top mount assemblies, as previously discussed, Steed added that the "rear is going to be assembled in Mexico."

82.     Defendants' representatives confirmed to MCS that the additional SUV volume would last for the same six-year duration as the committed truck program.

83.     Accordingly, MCS committed approximately $425,000 in additional capital to purchase additional equipment and upgrade other services related exclusively to the SUV volume.

**F.     With MCS Fully Invested in the T1XX Program, Defendants' Corporate Representatives Coerce MCS to Make Concessions to Maintain Its Relationship with Defendants**

84.     During the spring and summer of 2018, MCS was fully invested in and committed to production of top mount assemblies for the T1XX program related to GM's full-sized trucks.

85.     Although Defendants had not yet begun full-scale production for the T1XX truck program, MCS was immersed in preparations to bring the top mount assembly process online and to integrate that process with Defendants' supply chain.

86.     MCS was also fully engaged in bringing the T1XX top mount assembly program for GM's SUVs online.

87.     With the foregoing preparations in full swing, Ruth Burdine ("Burdine"), Defendants' "Sr. Commodity Buyer," unexpectedly reached out to Call for the purpose of discussing "a rebate on the business we are doing with MCS."

88.     Eventually, on or about July 18, 2018, Call met with Burdine and Gleidson Lima, a Tenneco commodity buyer from Tenneco Automotive Brazil Ltda., at Defendants' office in Monroe, Michigan.

14

89.     During that meeting, Burdine demanded MCS give Defendants a productivity "rebate" related to the work MCS previously performed for Defendants over the prior three years.

90.     Specifically, Burdine demanded MCS pay Defendants $100,000 and stated that it would be in MCS's "best interests" to comply with her demand.

91.     Given the nature and tone of the meeting, Call understood Burdine's demand for payment may have serious ramifications on MCS's significant investments in the T1XX program.

92.     Moreover, as Defendants had never treated MCS as a traditional supplier, but rather as an extension of Tenneco Napoleon, MCS operated with significantly reduced profit margins than traditional suppliers. Accordingly, MCS could not commit to a $100,000 payment for prior work.

93.     On July 30, 2018, Call responded to Burdine's demand and, in lieu of making a monetary commitment, documented several significant monetary expenses that MCS had absorbed to accommodate Defendants, which totaled over $1M.

94.     Among other things, Call explained that MCS agreed to reduce the T1XX top mount assembly cost from K2XX, pay for new machines, pay tooling costs associated with the T1XX program, and pay for several new machines necessary to handle T1XX design and engineering changes without the benefit of any tooling reimbursements.

95.     Call also noted that Defendants had also extended its payment term, which caused MCS to absorb $100,000.00 in receivables.

96.    In response, Burdine chastised Call and stated, "It is not acceptable for you to say you do not agree to pay productivity. I suggest you review this again and come back with productivity."

97.    Eventually, Call relented and offered $3,750 per quarter for four quarters to satisfy the demand.

98.    Burdine responded and demanded MCS "come up closer to $15,000 per quarter."

99.    Call then increased the offer to $5,600.00, explaining that amount was "all we can commit to."

100.    Burdine responded, "Send a credit this week" and MCS complied.

101.    Toward the end of 2018, MCS was also working to complete the tooling and equipment associated with the T1XX program.

102.    On October 22, 2018, even though the K2XX program was still running and the T1XX program had not yet come online, Defendants demanded that MCS quickly complete all four T1XX assembly tools.

103.    Although all four tools would not be needed until mid-2019, Defendants stated that they had "$130,000 in tooling recovery held up" because all four tools from MCS had not yet been completed.

104.    Defendants' revelation about tooling dollars from GM associated with the top mount assemblies surprised MCS, as Defendants had consistently represented that no tooling money had been allowed, compelling MCS to absorb those costs.

105.    Nevertheless, MCS worked to get an additional tool built by the end of 2018 and the remaining tools built in early 2019, so Defendants could recoup and pocket $130,000 for tooling costs related to tooling paid for by MCS.

16

### G.  MCS Commences Production on the T1XX Top Mount Assemblies and Defendants Threaten to Strip MCS of the T1XX Program

106.  In January 2019, MCS began ramping up production on top mount assemblies for the T1XX program while still producing top mount assemblies for Defendants with respect to the K2XX program.

107.  In May 2019, MCS began full production for the T1XX program.

108.  In early June 2019, Burdine unexpectedly reached out to Call once again and requested a meeting.

109.  On or about June 21, 2019, Burdine informed Call that Defendants may strip MCS of the T1XX program and move all top mount assemblies for GM trucks and SUVs to Defendants' Reynosa, Mexico facility.

110.  On June 24, 2019, Burdine asked for a quote related to MCS's T1XX capital "in the event our conversation with our customer gets to this level."

111.  On July 17, 2019, Call responded on behalf of MCS by letter and reiterated the commitment Defendants made to MCS, the capital equipment expenditures MCS made to perform its own commitments, the physical expansion costs necessitated by the program, and the patented process developed by MCS for top mount assemblies.

112.  While MCS expressed its desire for Defendants to honor their existing contractual relationship, MCS provided monetary figures related to MCS's equipment costs, expansion costs, and patent royalties.

113.  By February 2020, Defendants had not resolved their June 2019 threat to move the T1XX top mounts assembly project to Reynosa, Mexico and MCS continued to produce top mount assemblies, as promised.

17

114. Accordingly, MCS engaged legal representation to obtain clarity with respect to Defendants' intentions; however, no such clarity materialized and soon thereafter, the nation was struck by various shutdowns due to COVID-19.

115. MCS continued to provide top mount assemblies for the T1XX program throughout 2020.

116. On February 24, 2021, Jim Braddock, Defendants' Director of Global Purchasing, sent MCS an e-mail containing a purported six-month termination notice related to all T1XX top mount assembly pieces produced for Defendants by MCS.

117. Despite the purported six-month notice, MCS continued to produce T1XX top mount assemblies for Defendants through October 22, 2021 (for GM trucks) and March 15, 2022 for GM SUVs, at which time Defendants ceased using MCS for T1XX production.

118. Upon information and belief, Defendants have been assembling top mounts for the T1XX program at their facility in Reynosa, Mexico.

## COUNT ONE
### (Breach of Contract – U.C.C.)

119. MCS incorporates all prior allegations as if fully restated herein.

120. MCS is a "seller" pursuant to R.C. § 1302.01(A)(4).

121. Defendants are "buyers" pursuant to R.C. § 1302.01(A)(1).

122. MCS and Defendants had a valid and enforceable "contract" pursuant to R.C. § 1302.01(A)(11) whereby Defendants promised to pay MCS for "goods" – 2 million T1XX top mount assemblies for GM trucks annually for six years at a cost of $0.395 per unit.

123. MCS and Defendants had a valid and enforceable "contract" pursuant to R.C. § 1302.01(A)(11) whereby Defendants promised to pay MCS for additional "goods" – 680,000 T1XX top mount assemblies for GM SUVs annually for six years at a cost of $0.395 per unit.

18

124.    Defendants had an obligation to act in good faith with respect to their performance under the contracts.

125.    MCS has fully and satisfactorily performed all of its agreed-upon obligations under the contracts and has at all relevant times remained willing and able to proceed under the contracts.

126.    Defendants have materially breached the contracts through an anticipatory repudiation and/or terminating the contracts prior to the end of the six-year terms and failing to meet volume commitments.

127.    Defendants have failed or refused to perform their obligations under the contracts in good faith.

128.    As a direct and proximate cause of Defendants' material breaches, MCS has suffered direct, incidental, and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT TWO
### (Breach of Contract – Common Law)

129.    MCS incorporates all prior allegations as if fully restated herein.

130.    Alternatively, MCS and Defendants had a valid and enforceable common law agreement whereby Defendants promised to pay MCS to assemble 2 million T1XX top mount assemblies for GM trucks annually for six years at a cost of $0.395 per unit.

131.    Alternatively, MCS and Defendants had a valid and enforceable common law agreement whereby Defendants promised to pay MCS to assemble an additional 680,000 T1XX top mount assemblies for GM SUVs annually for six years at a cost of $0.395 per unit.

132.    MCS has fully and satisfactorily performed all of its agreed upon obligations.

133. Defendants have materially breached the agreements by terminating the agreements prior to the end of the six-year term and failing to meet their volume commitments.

134. As a direct and proximate cause of Defendants' material breaches, MCS has suffered direct and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT THREE
### (Promissory Estoppel)

135. MCS incorporates all prior allegations as if fully restated herein.

136. During the course of their relationship with MCS, Defendants made numerous express and implied promises to MCS.

137. MCS justifiably relied upon Defendants' promises to MCS's detriment.

138. As a direct and proximate cause of Defendants' broken promises, MCS has suffered direct, incidental, and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT FOUR
### (Fraudulent Inducement)

139. MCS incorporates all prior allegations as if fully restated herein.

140. During the course of their relationship with MCS, Defendants made material representations to MCS regarding the volume and duration of the T1XX top mount assembly project.

141. Defendants made those representations for the purpose of inducing MCS to make significant capital expenditures and provide Defendants with products, so Defendants could meet their own third-party commitments.

142.    Upon information and belief, Defendants made those representations without any intention to honor their express promises.

143.    Defendants also made material representations regarding the availability of "tooling" dollars from General Motors in relation to the capital costs necessary to bring the top mount assembly process online.

144.    Defendants made those representations for the purpose of inducing MCS to make significant capital expenditures on tooling without compensation.

145.    MCS justifiably relied upon Defendants' material representations.

146.    As a direct and proximate result of Defendants' misrepresentations, MCS has been damaged in an amount in excess of $2.5MM, plus interest, costs, expenses, reasonable attorneys' fees, and punitive damages.

WHEREFORE, Plaintiff MCS requests that this Court enter judgment in favor of MCS and against Defendants for:

A.    Compensatory damages in an amount in excess of $2.5MM for such sums as will compensate MCS for the injuries alleged herein;

B.    Interest, costs, expenses, and reasonable attorneys' fees;

C.    Punitive damages; and

D.    Such other relief that the Court deems just and equitable.


Nicholas T. Stack
Thomas P. Dillon
SHUMAKER, LOOP & KENDRICK, LLP
Attorneys for MCS Manufacturing, LLC

21

## **JURY DEMAND**

MCS Manufacturing, LLC demands trial by jury on all issues so triable.

Nicholas T. Stack
Thomas P. Dillon
SHUMAKER, LOOP & KENDRICK, LLP

AUG 1 2 2022



**Corporate Creations Network Inc.**
801 US Highway 1 North Palm Beach, FL 33408

Tenneco Inc.                                    09/06/2022
HR contact
DRiV
7450 N. McCormick Blvd
Skokie IL 60076

# SERVICE OF PROCESS NOTICE

The following is a courtesy summary of the enclosed document(s).  **ALL information should be verified by you.**

Item: 2022-480

Note: Any questions regarding the substance of the matter described below, including the status or how to respond, should be directed to the contact set forth in line 12 below or to the court or government agency where the matter is being heard. IMPORTANT: All changes or updates to the SOP contact individuals or their contact information must be submitted in writing to SOPcontact@corpcreations.com. Any changes will become effective upon written confirmation of Corporate Creations.

| 1. | Entity Served: | Tenneco Inc. |
|---|---|---|
| 2. | Title of Action: | MCS Manufacturing, LLC vs. Tenneco, Inc., et al. |
| 3. | Document(s) Served: | Alias Summons on Complaint<br>Complaint for Damages with Jury Demand Endorsed Hereon<br>Praecipe |
| 4. | Court/Agency: | Fulton County Common Pleas Court |
| 5. | State Served: | Delaware |
| 6. | Case Number: | 22CV000133 |
| 7. | Case Type: | Breach of Contract |
| 8. | Method of Service: | Certified Mail |
| 9. | Date Received: | Friday 09/02/2022 |
| 10. | Date to Client: | Tuesday 09/06/2022 |
| 11. | # Days When Answer Due: Answer Due Date: | 28<br>Friday 09/30/2022 | CAUTION: Client is solely responsible for verifying the accuracy of the estimated Answer Due Date. To avoid missing a crucial deadline, we recommend immediately confirming in writing with opposing counsel that the date of the service in their records matches the Date Received. |
| 12. | Sop Sender:<br>(Name, City, State, and Phone Number) | Nicholas T. Stack<br>Toledo, OH<br>(419) 241-9000 |
| 13. | Shipped To Client By: | Email Only with PDF Link |
| 14. | Tracking Number: | |
| 15. | Handled By: | 081 |
| 16. | Notes: | |

NOTE: This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information.  At Corporate Creations, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process. To decrease risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective.  It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by Corporate Creations Network Inc.

# In The Court of Common Pleas
## Fulton County, Ohio

| | | |
|---|---|---|
| **MCS MANUFACTURING LLC** | : | **Case No. 22CV000133** |
| PLAINTIFF | : | |
| **Vs.** | : | Judge Jeffrey L. Robinson |
| **TENNECO INC** | : | |
| DEFENDANT | : | **ALIAS** |
| | : | **SUMMONS ON COMPLAINT** |

TO:  **TENNECO INC**
    **C/O CORPORATE CREATIONS NETWORK**
    **3411 SILVERSIDE RD**
    **TATNALL BUILDING**
    **SUITE 104**
    **WILMINGTON, DE  19810**

YOU ARE HEREBY SUMMONED that a complaint (a copy of which is hereby attached and made a part hereof) has been filed against you in this court by the Plaintiff(s) named herein.

You are required to serve upon the Plaintiff(s)attorney, or the Plaintiff if the plaintiff has no attorney of record, a copy of your answer to the complaint within *__twenty eight (28)__* days after service of this summons upon you, exclusive of the day of service.  Said answer must be filed with this court within *__three (3)__* days after service on the Plaintiff(s) attorney.  The address of the *Clerk of the Fulton County Court of Common Pleas is Room 102, Courthouse, 210  S. Fulton Street, Wauseon, Ohio  43567*.

The name and address of the Plaintiff(s) Attorney is as follows:
        NICHOLAS T STACK
        1000 JACKSON STREET
        TOLEDO, OH 43604-5573

If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

                        Tracy L. Zuver
                        Fulton County Clerk of
                        Common Pleas Court

August 24, 2022

                        *Wendy Teddyke*
                        Deputy Clerk of Courts

FILED
FULTON COUNTY

2022 AUG -8 AM 10: 12

TRACY L. ZUVER
CLERK

## IN THE COURT OF COMMON PLEAS
## FULTON COUNTY, OHIO

MCS MANUFACTURING, LLC,
15210 County Rd. 10-3
Lyons, Ohio 43533,

        Plaintiff,

-vs-

TENNECO, INC.,
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

and

TENNECO AUTOMOTIVE OPERATING
COMPANY, INC.,
c/o Corporate Creations Network, Inc.,
Statutory Agent
119 E. Court Street
Cincinnati, Ohio 45202,

and

DRiV INCORPORATED
c/o Corporate Creations Network, Inc.,
Statutory Agent
119 E. Court Street
Cincinnati, Ohio 45202

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 22CV000133

Judge Robinson

**COMPLAINT FOR DAMAGES WITH
JURY DEMAND ENDORSED HEREON**

Nicholas T. Stack (0086333)
Thomas P. Dillon (0059899)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604-5573
Telephone:   (419) 241-9000
Facsimile:   (419) 241-6894
E-mail:      nstack@shumaker.com
            tdillon@shumaker.com

Attorneys for MCS Manufacturing, LLC

\*     \*     \*

1

## NATURE OF ACTION

1.      This is an action to provide Plaintiff MCS Manufacturing, LLC ("MCS") a remedy for Defendants Tenneco, Inc., Tenneco Automotive Operating Company, Inc., and DRiV, Incorporated's (collectively, "Defendants") broken promises, misrepresentations, and pattern of coercion that crippled MCS's business.

2.      Tenneco is a publicly traded, Fortune 500 Company that, among other things, manufactures and distributes automotive components and original equipment, itself or through its subsidiaries and related entities, to major automobile manufacturers.  MCS is a small, Ohio employer based in Lyons, Ohio that provides custom assembly, tooling, and machining services, among other things.

3.      Beginning in 2008, MCS began working closely with Defendants' representatives in Napoleon, Ohio.  From Napoleon, Defendants engaged MCS on a wide array of projects.  Given MCS's close relationship with Defendants' Napoleon facility and representatives, MCS operated on decidedly slim profit margins to assist Defendants' Napoleon facility.

4.      Eventually, Defendants' Napoleon representatives committed to a specific multi-year, high-volume project related to the manufacture of struts for General Motors "K2XX" vehicle platform.  Specifically, Defendants engaged MCS to assemble top mounts, which were then included into Defendants' struts.  The top mount program required significant investment by MCS, including the development of a patented system and method for the efficient assembly of top mounts.  The top mount assembly project ran its course as agreed.

5.      In 2017, Defendants again engaged MCS to assemble top mounts – this time in relation to General Motors' next generation "T1XX" vehicle platform, which would eventually replace the K2XX platform.  In no uncertain terms, Defendants promised that the T1XX assembly

2

program awarded to MCS would last for six years at an annual volume of 2 million pieces. Defendants also represented to MCS that General Motors provided no "tooling" money, so MCS would need to absorb all capital costs related to tooling and equipment. Defendants also acknowledged that the scope of the program would necessitate an expansion of MCS's physical plant to accommodate the award and additional volume.

6.    By 2018, MCS was fully invested in plant improvements and equipment to bring the T1XX top mount assembly project online. MCS was also working diligently with Defendants' engineers and other representatives to perfect the top mount assembly parts and process in coordination with Defendants' supply chain.

7.    At that time, with MCS over a proverbial barrel, Defendants' corporate representatives suddenly demanded concessions from MCS in the form of "rebates" for prior work. More specifically, in the summer of 2018, Defendants demanded a payment or credit totaling $100,000. With the understanding that failure to remit a credit could have a devastating effect on MCS's T1XX project, MCS relented and provided Defendants with a rebate credit for four quarters.

8.    Later in 2018, Defendants demanded that MCS complete the manufacture of all equipment for the T1XX top mount assembly project prior to that equipment being necessary for production. Despite their prior representations that General Motors had provided no "tooling" money for the project, Defendants' representatives stated that they were in the process of recovering and pocketing $130,000 from General Motors for MCS's capital outlays.

9.    In June 2019, just months after the T1XX project came online, Defendants suddenly threatened to strip MCS of all T1XX work and move the project to Defendants' own facility in Reynosa, Mexico. Defendants' purported justification for their threat was premised upon a vague reference to "tariffs."

3

10.     Though delayed by COVID-19, Defendants eventually made good on their threat and stripped MCS of the T1XX program, in part, in October 2021 and completely by March 2022 with no compensation whatsoever for MCS.

11.     Ultimately, Defendants made a long-term commitment to MCS, but instead used MCS as a Guinea pig to perfect the top mount parts and process and provide early supply to meet Defendants' commitments to General Motors. Defendants then reneged on their promises to MCS in bad faith and without justification, leaving MCS holding the bag for significant capital costs without the benefit of the Parties' bargain. This action is intended to remedy the resulting injustice.

## PARTIES

12.     MCS is an Ohio limited liability company with its principal place of business in Fulton County, Ohio. MCS offers its customers a wide array of services with a focus on designing and building custom machinery and tooling. MCS also offers its customers several machine-based solutions to allow for the custom assembly of manufacturing components. MCS's sole member is Aaron Call who is an Ohio citizen and resident of Fulton County.

13.     Tenneco, Inc. ("Tenneco") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Tenneco touts itself as one of the world's leading designers, manufacturers, and marketers of automotive products for original equipment and aftermarket customers. Tenneco has maintained and operated out of several Ohio facilities, including a facility in Napoleon, Ohio.

14.     Tenneco Automotive Operating Company Inc. ("Tenneco Operating Company") is a Delaware corporation with its principal place of business in Lake Forest, Illinois and registered to do business in the State of Ohio. Tenneco Operating Company is a direct subsidiary of Tenneco that also designs and manufactures automotive systems and components.

4

Tenneco Operating Company has also maintained and operated out of several Ohio facilities, including a facility in Napoleon, Ohio.

15. DRiV Incorporated ("DRiV") is a Delaware corporation with its principal place of business in Lake Forest, Illinois and registered to do business in the State of Ohio. DRiV is a subsidiary, affiliate, or division of Tenneco that manufactures and distributes original and aftermarket automobile parts.

16. Tenneco, Tenneco Operating Company, and DRiV provide automobile components to several major automobile manufacturers, including General Motors, Ford, Stellantis, Daimler, and others.

## JURISDICTION AND VENUE

17. This Court has personal jurisdiction over the Defendants pursuant to R.C. § 2307.382(A)(1), (A)(2), (A)(3), (A)(4), and/or (A)(6).

18. Venue in this Court is proper pursuant to Civil Rule 3(C)(3), (C)(6), and/or (C)(12).

## RELEVANT FACTS

**A.     MCS's History and Business in Lyons, Ohio.**

19. MCS was founded by Aaron Call ("Call") in Lyons, Ohio in 2008.

20. MCS was the product of Call's prior machining experience and engineering knowledge, as well as his vision to bring the worlds of machine building and component assembly together under one roof.

21. As MCS grew, it began offering cutting edge, cost-effective machining and assembly solutions to its customers. MCS has continued to provide cutting edge, cost-effective solutions to its customers through today.

5

B.     **MCS's Early, Successful Relationship with Defendants Through Their Napoleon Facility**

22.     In mid-2008, MCS began working with Defendants through certain individuals located in Defendants' Napoleon facility ("Tenneco Napoleon").

23.     Defendants built and maintained their early business relationship with MCS exclusively through Defendants' representatives and managers at Tenneco Napoleon.

24.     MCS's first job for Defendants in 2008 was a welding project for the production of bushing inner tubes related to work at Tenneco Napoleon. After that first job, Tenneco Napoleon began using MCS regularly for a wide variety of projects including, but not limited to, robot welding, re-work, assembly, sorting, and packaging.

25.     During the first several years of the Parties' relationship, MCS worked directly with and through individuals at Tenneco Napoleon to supplement Tenneco Napoleon's capabilities.

26.     Throughout this period, Tenneco Napoleon did not treat MCS as a traditional supplier, but rather as an extension of Tenneco Napoleon whereby MCS would operate on thin margins and not be included in supplier meetings.

27.     Additionally, Defendants' representatives from Tenneco Napoleon would provide certain equipment directly to MCS for use on Defendants' projects, monitor MCS's work directly through Tenneco Napoleon's quality department, and provide all production part approval process ("PPAP") documentation for MCS's work to Defendants' customers – something a traditional supplier would do itself.

28.     Upon information and belief, Tenneco Napoleon's representatives intended to work with and through MCS to take advantage of lower labor costs at MCS and, accordingly, increase Tenneco Napoleon's reported profit margins.

6

29.     In 2013, General Motors ("GM") awarded Defendants a program to provide struts for use in GM's new "K2XX" vehicle platform that GM developed for its line of full-size trucks and SUVs.

30.     Subsequently, representatives from Tenneco Napoleon approached and negotiated with MCS to provide a manufacturing and assembly solution for the top mounts that would be incorporated into Defendants' strut.

31.     Defendants' Tenneco Napoleon representatives then committed to a seven-year program whereby MCS would assemble an average volume of 120,000 top mounts per month on behalf of Tenneco Napoleon.

32.     In light of both the longevity and volume of Defendants' commitment, MCS made a considerable investment to expand its facility, purchase custom presses, tooling, and supporting equipment, and create a dedicated assembly line for the K2XX project.

33.     Additionally, Call co-developed and patented a specific system and method for assembling top mounts.

34.     MCS began assembling the top mounts for the K2XX program in 2013 and continued to produce the K2XX top mounts for over seven years, when the K2XX relationship ended as agreed.

C.      **Defendants Negotiate with and Award MCS a Multi-Year Project for Assembly Work on GM's Next Generation Vehicle Platform – the T1XX – at Quoted Annual Volumes**

35.     By 2015, GM had already developed its next generation vehicle platform – the T1XX – to replace the K2XX platform.

7

36.     Given MCS's success working on the K2XX program through Tenneco Napoleon, Defendants contacted MCS about top mount assembly work related to the T1XX program.

37.     On September 2, 2015, Dave Beggs ("Beggs"), one of Defendants' corporate representatives, reached out to Call and wrote that Defendants were "looking at options" for assembly prices to include in a bid for the T1XX top mount.

38.     Mr. Beggs wrote that Defendants had decided to give MCS "a shot" at quoting the related assembly work, noting that the "target is $.29" per piece and the "quoted volume is 2mm pcs per year."

39.     After considering certain T1XX top mount design changes, additional tooling needed, and the incorporation of an additional spring seat assembly into the assembly process, Call wrote to Beggs on September 15, 2015 and described what Call believed to be pricing for "the most effective solution."

40.     Specifically, MCS offered to take on the project at a cost of $0.49 per piece with Defendants providing $75,000 for tooling. MCS also offered to "give back 2% a year" for the years remaining on the K2XX program.

41.     Subsequently, MCS and Defendants' representatives negotiated a lower $0.395 price per piece, with certain added capital costs absorbed by MCS based upon Defendants' representations that General Motors offered no tooling money for the project.

42.     Given the target price and capital expenditures that would be required by MCS, the profit margin that would be realized by MCS was slim.

43.     On July 12, 2016, Beggs wrote to Call acknowledging that Beggs received the "lower price" per piece, but reiterated that Defendants had no assembly "tooling dollars" for the

project. Beggs asked Call to "absorb" the tooling costs with no changes to the lower per piece price.

44.     Beggs confirmed that Defendants had been "awarded this business" and reiterated that it would be a "6 yr. program that starts in mid 2018."

45.     On July 14, 2016, Call responded and wrote that MCS "will figure out a way to make it work."

46.     During this time, Tom Weaver ("Weaver"), a representative from Tenneco Napoleon recognized the potential for eliminating "cross-docking" of product between Tenneco Napoleon and MCS and discussed with Call the need for MCS to build out additional dock and warehouse space to handle bulk components directly from China.

47.     On November 11, 2016, Tom Billerman ("Billerman"), another of Defendants' corporate representatives provided a breakdown of the annual volume and confirmed that the total annual volume at MCS for T1XX top mount assemblies would be 2,092,675 pieces per year.

48.     In December 2016, Defendants alerted MCS to new issues that would necessitate additional equipment and tooling.

49.     Specifically, Defendants revealed a design change in the T1XX program and, also, a need to maintain the K2XX assembly program while the T1XX ramped up. Both revelations added more capital costs related, in part, to the need to switch certain equipment between the two programs as they ran simultaneously. Accordingly, MCS asked for $40,000 in tooling costs.

50.     On December 15, 2016, Beggs responded reiterating that Defendants had "no tooling dollars" for the top mount assembly and needed "confirmation" that the price would remain $0.395 per piece.

51.     The same day, Call responded that the $0.395 assembly price per piece would remain the same, but again requested $40,000 in tooling reimbursement.

52.     Without a response from Beggs, Call reached out to one of Defendants' Tenneco Napoleon representatives, Jason Brown, who supported MCS's request for tooling dollars in the form of a $0.015 increase to the price per piece until the total amount covered $40,000.

53.     On January 4, 2017, Beggs responded. Beggs again stated that MCS was "to absorb all tooling to receive the business," which was moving to the United States "from China." Beggs refused to allow for any tooling costs and finished by writing, "This is a big piece of business for MCS that's supposed to run several years so let me know where you stand with this extra $40k as we have to make fast decisions for this …."

54.     Ultimately, given Defendants' representations that GM offered no tooling money for the project and the longevity of the project, MCS agreed to absorb the associated tooling costs despite the already slim profit margin associated with the project.

55.     On January 25, 2017, Defendants formally awarded MCS the six-year, 2 million piece per year T1XX top mount assembly project at a $0.395 price per piece with MCS absorbing associated tooling costs ("Award").

56.     Specifically, Doug Steed ("Steed") wrote:

Pursuant to the award of the component(s) listed below to Tenneco. Tenneco has selected MCS as the supplier of these component(s). This selection is based on MCS quote response and all correspondence with regards to the component(s). Tooling PO(s) will be released shortly, if applicable. This email is to be used as the official kickoff for this part and time-table henceforth.

10

57.     Steed identified two specific T1XX truck-related part numbers for assembly at a production cost of $0.395 per piece.

58.     The e-mail included Steed's electronic signature and related contact information, which identified him as Defendants' "Applications / Program Buyer" for "Global Purchasing."

**D.      MCS Makes Considerable Investments in Equipment and Facilities and Develops Assembly Design Solutions to Accommodate the T1XX Award**

59.     After Defendants formally awarded MCS the six-year project, MCS immediately began making the investments necessary to support the project.

60.     Within two weeks of the Award, MCS began working to develop, design, and purchase the necessary equipment, tooling, and assembly solutions.

61.     Among other things, Call co-designed, manufactured, and patented a new system and method for the assembly of top mounts for the T1XX program.

62.     Between the date of the Award and commencement of production, MCS invested hundreds of thousands of dollars in necessary tooling, machinery, and other equipment related to the T1XX program.  For example, MCS upgraded its presses and purchased new assembly tooling with spares, a tow motor, two new spring seat machines, new dumpers, ovens, a new hydraulic cylinder, and several additional pieces of equipment.

63.     To accommodate the Award, and as discussed with Tenneco Napoleon's representatives, MCS also invested significant amounts to expand its Lyons, Ohio facility.

64.     Specifically, MCS invested over $650,000 to build additional warehouse space, docking space, and shop floor space in a 10,000 sq. ft. expansion.

65.     MCS committed to the expansion of its facility in 2017 and broke ground during the spring of 2018.

11

66. The need to expand and invest in the facility to accommodate the Award was well-known to and, in fact, expected by Defendants' representatives.

67. Not only did Weaver inquire about expansion during the negotiation process, but also Billerman inquired about MCS's expansion plans for warehouse and dock space at or about the time of the Award.

68. Subsequently, Call kept the individuals at Tenneco Napoleon apprised of the progress with the expansion and buildout process.

**E.      MCS Prepares for Production and Defendants Commit to Additional Top Mount Assembly Volume for GM SUVs**

69. In addition to the substantial capital investments MCS committed to the T1XX program in 2017 and 2018, MCS also invested a significant amount of time and effort working closely with Defendants to test and make adjustments to the top mount assembly prior to its incorporation into the strut supply chain.

70. MCS actively worked with Defendants so that Defendants could demonstrate to GM that their struts satisfied the PPAP and warrant to GM that the struts could be manufactured consistently in accordance with GM's requirements.

71. Among other things, MCS discovered that certain plastic bushings provided to MCS for incorporation into the top mounts were cracking and breaking during the assembly process. To remedy the issue and ensure the assembled top mounts met quality specifications, MCS invested in several compact ovens to ensure the integrity of the components. The new ovens required additional labor costs for operating the ovens and additional capital costs for the ovens themselves and related equipment.

72. In response to Defendants' unilateral alteration of packing materials during launch, MCS was also compelled to add an additional operator to handle the modifications.

12

73.     In addition, MCS coordinated with Defendants' other facilities, including a facility in Reynosa, Mexico, to provide samples and hone issues related to quality control, timing, and shipping.

74.     Notably, throughout this preparation process, Defendants consistently grouped MCS with Tenneco Napoleon and referred to MCS in product-related correspondence as "MCS/Napoleon."

75.     In early 2018, and prior to mass production coming online, Defendants approached MCS to add additional volume to the T1XX program. The additional volume would add top mount assembly volume related to front and rear struts destined for GM's SUVs.

76.     On May 2, 2018, Call informed Defendants that the increased volume would require additional equipment to avoid over-scheduling the equipment already committed to production of top mount assemblies related to GM's full-sized trucks.

77.     The same day, Bryan Jones, Defendants' corporate senior program manager in charge of the T1XX SUV launch, responded and provided increased volume breakdowns that incorporated the SUV pieces.

78.     Also on May 2, 2018, Call discussed SUV front and rear top mount timelines with Defendants' representatives.

79.     On May 30, 2018, Call followed up with Steed to get confirmation as to whether "MCS is a go" on the SUV program as "[l]aunch meetings" had begun for the SUV top mount.

80.     On October 2, 2018, Steed confirmed in writing that "MCS will soon receive the award for the T1XX SUV Front assembly work. Can you forward your timing?"

81.    However, rather than award MCS both the front and rear strut top mount assemblies, as previously discussed, Steed added that the "rear is going to be assembled in Mexico."

82.    Defendants' representatives confirmed to MCS that the additional SUV volume would last for the same six-year duration as the committed truck program.

83.    Accordingly, MCS committed approximately $425,000 in additional capital to purchase additional equipment and upgrade other services related exclusively to the SUV volume.

**F.    With MCS Fully Invested in the T1XX Program, Defendants' Corporate Representatives Coerce MCS to Make Concessions to Maintain Its Relationship with Defendants**

84.    During the spring and summer of 2018, MCS was fully invested in and committed to production of top mount assemblies for the T1XX program related to GM's full-sized trucks.

85.    Although Defendants had not yet begun full-scale production for the T1XX truck program, MCS was immersed in preparations to bring the top mount assembly process online and to integrate that process with Defendants' supply chain.

86.    MCS was also fully engaged in bringing the T1XX top mount assembly program for GM's SUVs online.

87.    With the foregoing preparations in full swing, Ruth Burdine ("Burdine"), Defendants' "Sr. Commodity Buyer," unexpectedly reached out to Call for the purpose of discussing "a rebate on the business we are doing with MCS."

88.    Eventually, on or about July 18, 2018, Call met with Burdine and Gleidson Lima, a Tenneco commodity buyer from Tenneco Automotive Brazil Ltda., at Defendants' office in Monroe, Michigan.

14

89.    During that meeting, Burdine demanded MCS give Defendants a productivity "rebate" related to the work MCS previously performed for Defendants over the prior three years.

90.    Specifically, Burdine demanded MCS pay Defendants $100,000 and stated that it would be in MCS's "best interests" to comply with her demand.

91.    Given the nature and tone of the meeting, Call understood Burdine's demand for payment may have serious ramifications on MCS's significant investments in the T1XX program.

92.    Moreover, as Defendants had never treated MCS as a traditional supplier, but rather as an extension of Tenneco Napoleon, MCS operated with significantly reduced profit margins than traditional suppliers. Accordingly, MCS could not commit to a $100,000 payment for prior work.

93.    On July 30, 2018, Call responded to Burdine's demand and, in lieu of making a monetary commitment, documented several significant monetary expenses that MCS had absorbed to accommodate Defendants, which totaled over $1M.

94.    Among other things, Call explained that MCS agreed to reduce the T1XX top mount assembly cost from K2XX, pay for new machines, pay tooling costs associated with the T1XX program, and pay for several new machines necessary to handle T1XX design and engineering changes without the benefit of any tooling reimbursements.

95.    Call also noted that Defendants had also extended its payment term, which caused MCS to absorb $100,000.00 in receivables.

15

96. In response, Burdine chastised Call and stated, "It is not acceptable for you to say you do not agree to pay productivity. I suggest you review this again and come back with productivity."

97. Eventually, Call relented and offered $3,750 per quarter for four quarters to satisfy the demand.

98. Burdine responded and demanded MCS "come up closer to $15,000 per quarter."

99. Call then increased the offer to $5,600.00, explaining that amount was "all we can commit to."

100. Burdine responded, "Send a credit this week" and MCS complied.

101. Toward the end of 2018, MCS was also working to complete the tooling and equipment associated with the T1XX program.

102. On October 22, 2018, even though the K2XX program was still running and the T1XX program had not yet come online, Defendants demanded that MCS quickly complete all four T1XX assembly tools.

103. Although all four tools would not be needed until mid-2019, Defendants stated that they had "$130,000 in tooling recovery held up" because all four tools from MCS had not yet been completed.

104. Defendants' revelation about tooling dollars from GM associated with the top mount assemblies surprised MCS, as Defendants had consistently represented that no tooling money had been allowed, compelling MCS to absorb those costs.

105. Nevertheless, MCS worked to get an additional tool built by the end of 2018 and the remaining tools built in early 2019, so Defendants could recoup and pocket $130,000 for tooling costs related to tooling paid for by MCS.

16

### G. MCS Commences Production on the T1XX Top Mount Assemblies and Defendants Threaten to Strip MCS of the T1XX Program

106.    In January 2019, MCS began ramping up production on top mount assemblies for the T1XX program while still producing top mount assemblies for Defendants with respect to the K2XX program.

107.    In May 2019, MCS began full production for the T1XX program.

108.    In early June 2019, Burdine unexpectedly reached out to Call once again and requested a meeting.

109.    On or about June 21, 2019, Burdine informed Call that Defendants may strip MCS of the T1XX program and move all top mount assemblies for GM trucks and SUVs to Defendants' Reynosa, Mexico facility.

110.    On June 24, 2019, Burdine asked for a quote related to MCS's T1XX capital "in the event our conversation with our customer gets to this level."

111.    On July 17, 2019, Call responded on behalf of MCS by letter and reiterated the commitment Defendants made to MCS, the capital equipment expenditures MCS made to perform its own commitments, the physical expansion costs necessitated by the program, and the patented process developed by MCS for top mount assemblies.

112.    While MCS expressed its desire for Defendants to honor their existing contractual relationship, MCS provided monetary figures related to MCS's equipment costs, expansion costs, and patent royalties.

113.    By February 2020, Defendants had not resolved their June 2019 threat to move the T1XX top mounts assembly project to Reynosa, Mexico and MCS continued to produce top mount assemblies, as promised.

17

114.    Accordingly, MCS engaged legal representation to obtain clarity with respect to Defendants' intentions; however, no such clarity materialized and soon thereafter, the nation was struck by various shutdowns due to COVID-19.

115.    MCS continued to provide top mount assemblies for the T1XX program throughout 2020.

116.    On February 24, 2021, Jim Braddock, Defendants' Director of Global Purchasing, sent MCS an e-mail containing a purported six-month termination notice related to all T1XX top mount assembly pieces produced for Defendants by MCS.

117.    Despite the purported six-month notice, MCS continued to produce T1XX top mount assemblies for Defendants through October 22, 2021 (for GM trucks) and March 15, 2022 for GM SUVs, at which time Defendants ceased using MCS for T1XX production.

118.    Upon information and belief, Defendants have been assembling top mounts for the T1XX program at their facility in Reynosa, Mexico.

### COUNT ONE
### (Breach of Contract – U.C.C.)

119.    MCS incorporates all prior allegations as if fully restated herein.

120.    MCS is a "seller" pursuant to R.C. § 1302.01(A)(4).

121.    Defendants are "buyers" pursuant to R.C. § 1302.01(A)(1).

122.    MCS and Defendants had a valid and enforceable "contract" pursuant to R.C. § 1302.01(A)(11) whereby Defendants promised to pay MCS for "goods" – 2 million T1XX top mount assemblies for GM trucks annually for six years at a cost of $0.395 per unit.

123.    MCS and Defendants had a valid and enforceable "contract" pursuant to R.C. § 1302.01(A)(11) whereby Defendants promised to pay MCS for additional "goods" – 680,000 T1XX top mount assemblies for GM SUVs annually for six years at a cost of $0.395 per unit.

124. Defendants had an obligation to act in good faith with respect to their performance under the contracts.

125. MCS has fully and satisfactorily performed all of its agreed-upon obligations under the contracts and has at all relevant times remained willing and able to proceed under the contracts.

126. Defendants have materially breached the contracts through an anticipatory repudiation and/or terminating the contracts prior to the end of the six-year terms and failing to meet volume commitments.

127. Defendants have failed or refused to perform their obligations under the contracts in good faith.

128. As a direct and proximate cause of Defendants' material breaches, MCS has suffered direct, incidental, and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT TWO
### (Breach of Contract – Common Law)

129. MCS incorporates all prior allegations as if fully restated herein.

130. Alternatively, MCS and Defendants had a valid and enforceable common law agreement whereby Defendants promised to pay MCS to assemble 2 million T1XX top mount assemblies for GM trucks annually for six years at a cost of $0.395 per unit.

131. Alternatively, MCS and Defendants had a valid and enforceable common law agreement whereby Defendants promised to pay MCS to assemble an additional 680,000 T1XX top mount assemblies for GM SUVs annually for six years at a cost of $0.395 per unit.

132. MCS has fully and satisfactorily performed all of its agreed upon obligations.

19

133.     Defendants have materially breached the agreements by terminating the agreements prior to the end of the six-year term and failing to meet their volume commitments.

134.     As a direct and proximate cause of Defendants' material breaches, MCS has suffered direct and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT THREE
### (Promissory Estoppel)

135.     MCS incorporates all prior allegations as if fully restated herein.

136.     During the course of their relationship with MCS, Defendants made numerous express and implied promises to MCS.

137.     MCS justifiably relied upon Defendants' promises to MCS's detriment.

138.     As a direct and proximate cause of Defendants' broken promises, MCS has suffered direct, incidental, and consequential damages in an amount in excess of $2.5MM, plus interest, costs, and reasonable attorneys' fees.

## COUNT FOUR
### (Fraudulent Inducement)

139.     MCS incorporates all prior allegations as if fully restated herein.

140.     During the course of their relationship with MCS, Defendants made material representations to MCS regarding the volume and duration of the T1XX top mount assembly project.

141.     Defendants made those representations for the purpose of inducing MCS to make significant capital expenditures and provide Defendants with products, so Defendants could meet their own third-party commitments.

20

142. Upon information and belief, Defendants made those representations without any intention to honor their express promises.

143. Defendants also made material representations regarding the availability of "tooling" dollars from General Motors in relation to the capital costs necessary to bring the top mount assembly process online.

144. Defendants made those representations for the purpose of inducing MCS to make significant capital expenditures on tooling without compensation.

145. MCS justifiably relied upon Defendants' material representations.

146. As a direct and proximate result of Defendants' misrepresentations, MCS has been damaged in an amount in excess of $2.5MM, plus interest, costs, expenses, reasonable attorneys' fees, and punitive damages.

WHEREFORE, Plaintiff MCS requests that this Court enter judgment in favor of MCS and against Defendants for:

A. Compensatory damages in an amount in excess of $2.5MM for such sums as will compensate MCS for the injuries alleged herein;

B. Interest, costs, expenses, and reasonable attorneys' fees;

C. Punitive damages; and

D. Such other relief that the Court deems just and equitable.

Nicholas T. Stack
Thomas P. Dillon
SHUMAKER, LOOP & KENDRICK, LLP
Attorneys for MCS Manufacturing, LLC

21

## JURY DEMAND

MCS Manufacturing, LLC demands trial by jury on all issues so triable.


Nicholas T. Stack
Thomas P. Dillon
SHUMAKER, LOOP & KENDRICK, LLP

22



FILED
FULTON COUNTY
~~ ~~ ~~ ~~

2022 AUG -8 AM 10: 12

TRACY L. ZUVER
CLERK

## IN THE COURT OF COMMON PLEAS
## FULTON COUNTY, OHIO

MCS MANUFACTURING, LLC,
15210 County Rd. 10-3
Lyons, Ohio 43533,

      Plaintiff,

-vs-

TENNECO, INC.,
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

and

TENNECO AUTOMOTIVE OPERATING
COMPANY, INC.,
c/o Corporate Creations Network, Inc.,
Statutory Agent
119 E. Court Street
Cincinnati, Ohio 45202,

and

DRiV INCORPORATED
c/o Corporate Creations Network, Inc.,
Statutory Agent
119 E. Court Street
Cincinnati, Ohio 45202

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 22CVO00133

Judge Robinson

**PRAECIPE**

Nicholas T. Stack (0086333)
Thomas P. Dillon (0059899)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604-5573
Telephone:  (419) 241-9000
Facsimile:  (419) 241-6894
E-mail:     nstack@shumaker.com
            tdillon@shumaker.com

Attorneys for MCS Manufacturing, LLC

          *      *      *

TO THE CLERK OF COURTS:

Pursuant to Ohio Civil Rule 4.1, please serve a copy of the Summons and Complaint by certified mail upon the following:


TENNECO, INC.,
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

and

TENNECO AUTOMOTIVE OPERATING COMPANY, INC.,
c/o Corporate Creations Network, Inc., Statutory Agent
119 E. Court Street
Cincinnati, Ohio 45202,

and

DRiV INCORPORATED
c/o Corporate Creations Network, Inc., Statutory Agent
119 E. Court Street
Cincinnati, Ohio 45202

Nicholas T. Stack (0086333)
Thomas P. Dillon (0059899)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604-5573
Telephone:      (419) 241-9000
Facsimile:      (419) 241-6894
E-mail:          nstack@shumaker.com
                 tdillon@shumaker.com

Attorneys for MCS Manufacturing, LLC

SEP 0 2 2022