IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MCS Manufacturing LLC,           Case No. 3:22 CV 1603

       Plaintiff,           <u>MEMORANDUM OPINION</u>

   -vs-
          JUDGE JACK ZOUHARY
Tenneco Inc., et al.,

       Defendants.

## INTRODUCTION

For over a decade, Plaintiff MCS Manufacturing LLC assembled "top mounts" for Defendant Tenneco, Inc., a General Motors ("GM") supplier. In 2022, Tenneco terminated its contract with MCS after deciding to move all top mount assemblies to a factory in Mexico. This lawsuit ensued.

The suit against Tenneco, and its subsidiaries Tenneco Automotive Company Inc. and DRiV Inc., alleges three claims: breach of contract, promissory estoppel, and fraudulent inducement (Doc. 1-2 at 7–8). Tenneco now moves for summary judgment (Doc. 42), appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Civil Rule 56(a). The matter is fully briefed (Docs. 42, 43, 45–49), and this Court heard oral argument (Doc. 48).

## BACKGROUND

*Business History*

MCS is a small business in Lyons, Ohio founded in 2008 by Aaron Call. Its primary client, Tenneco, located in Napoleon, Ohio, provides part to GM. According to MCS, "Tenneco Napoleon provided MCS with equipment to run certain projects and, at times, treated MCS as a job shop for Tenneco Napoleon" (Doc. 45 at 7). Tenneco used "MCS as a Tenneco distribution site, allowed

MCS to serve as a direct pick-up point for products, and used MCS for other work that would be unusual for typical suppliers" (*id.*).

In 2013, MCS received its first major contract award from Tenneco -- the K2XX platform -- resulting in significant investment to prepare for the project. MCS's role was to assemble the top mounts, which would then be used in the struts Tenneco sent to GM. That same year, Tenneco implemented a new electronic supplier system, issuing "Scheduling Agreements," Purchase Orders, and material releases via the "SupplyWeb portal" and by email. Tenneco released periodic Scheduling Agreements, through the SupplyWeb portal, containing the quantity of top mounts needed. MCS would then assemble the parts and ship them to Tenneco. So far, so good.

By 2015, GM had developed a new truck platform, the T1XX, to replace the K2XX. Tenneco solicited a quote from MCS. According to MCS, the T1XX program required additional investments in new machines and equipment. Thus, MCS would need to plan for cost recovery over several years when determining a bid price. And, because Tenneco expected MCS to receive bulk material directly from China and then live-load finished goods, the need for MCS to expand its facility is undisputed (Doc. 45 at 9).

*A New Project*

Negotiations for this new project began in September 2015. Tenneco requested a "target price" of $0.29 per mount (Doc. 43-11 at 4). MCS countered with a bid of $0.49, plus $75,000 for tooling (*id.* at 3). Tenneco rejected this as too high. MCS came back with a price of $0.395, which Tenneco accepted, but stated there were no tooling dollars for the project and MCS would need to absorb that cost (*id.* at 2). We are now in July 2016. Tenneco further stated: "[W]e are still being told this is a 6 yr. program that starts mid 2018" (*id.*). Tenneco informed MCS: "Sales states this is going to run for 2 generations so we need to keep a clean launch and control cost[s] going forward

2

to keep the 10 yrs. of production" (Doc. 43-37 at 2). Two months later, in September, MCS took steps to acquire financing from a bank to expand operations for the T1XX.

In November 2016, MCS, still running K2XX mounts, asked for clarification of the new T1XX expected volumes, and Tenneco Program Engineer Tom Billerman responded with a figure of 2,092,675 T1 mounts per year (Doc. 43-15 at 2–3). Billerman cautioned MCS "will need to confirm capacity," as MCS would need to ramp up the T1XX project while winding down the K2XX project (*id.* at 2). In December, MCS asked for $40,000 for tooling; Tenneco again declined and asked to confirm the price would remain $0.395 (Doc. 43-19). On January 4, 2017, Tenneco stated: "This is a big piece of business for MCS that's supposed to run several years so let me know where you stand with this extra $40k as we have to make fast decisions . . . " (*id.* at 2). MCS opted to move forward without any tooling dollars.

### *An Award*

Three weeks later, on January 25, the numerous phone calls and emails culminated in an official Award to MCS (Doc. 43-20 at 2):

> Tenneco has selected MCS as the supplier of these components. This selection is based on MCS quote response and all correspondence with regards to the components. Tooling POs will be released shortly, if applicable. This email is to be used as the official kickoff for this part and time-table henceforth.

The email listed the price at $0.395 per piece (*id.*). MCS then began in earnest gearing up for the project: "Within two weeks of the Award, MCS began working to develop, design, and purchase the necessary equipment, tooling, and assembly solutions. Among other things, MCS co-designed, manufactured, and patented a new system and method for the assembly of top mounts for the T1XX program" (Doc. 45 at 12). In February, Tenneco volunteered, in a separate agreement, to pass on to MCS $15,140 in tooling money from GM (Doc. 43-33).

3

Now it is May 2017. Tenneco issues the first Scheduling Agreement of the project, which states it "incorporated" the conditions of purchase and supplier manual, and "supersede[d] all prior and contemporaneous oral or written agreements" (Doc. 43-4 at 2). The Scheduling Agreement dealt with the terms on quantity and duration (*id.* at 2–3):

> **Quantity.** . . . Any forecasts provided by Buyer of estimated quantities (including any such forecasts provided in a purchase order, scheduling agreement or outside the firm period of Buyer's releases) are not binding on Buyer and are for informational purposes only. Under no circumstances will Buyer be obligated to purchase any quantity of Products except as expressly provided for in the Agreement or in the firm period of Buyer's releases for Products.
>
> **Duration.** Unless otherwise provided in the Agreement, the initial term of the Agreement will commence upon acceptance and expire one-year thereafter, and . . . , the Agreement will automatically continue in effect thereafter for rolling one-year terms but will be terminable by either party on at least six months' written notice.

In May 2018, MCS received an additional Award for T1XX SUV platforms, and began investing in further expansion of its facility. Other Scheduling Agreements were issued during production, including one in September 2018 that increased the price to $0.44 due to a problem with "certain plastic bushings provided to MCS for incorporation into the top mounts [] cracking and breaking during the assembly process" (Doc. 45 at 13).

*Mexico*

With the T1XX program now well into in full production, all was well until, in June 2019, Tenneco Senior Commodities Buyer Ruth Burdine informed MCS the project may be terminated and moved to Mexico (Doc. 45-1 at 8–9). The program continued over the next year and a half, until February 2021 when Tenneco sent a six-month termination notice, as required by the Scheduling Agreement (Doc. 45-1 at 73). MCS continued producing T1XX top-mount assemblies for Tenneco until October 22, 2021 (for GM trucks) and March 15, 2022 (for GM SUVs). By that

time MCS had manufactured over 4 million T1XX parts as follows: 2019 -- 1.2 million; 2020 -- 1.5 million; 2021 -- 1.67 million.

## DISCUSSION

The above timeline covers seven years of the relationship between the parties. MCS asserts the January 2017 Award created an enforceable contract between the parties; Tenneco argues the May 2017 Scheduling Agreement is the only contract. If MCS is correct, Tenneco may have promised MCS a six-year project. But if the Scheduling Agreement controls, the phone calls and prior emails may be irrelevant, and Tenneco properly terminated the one-year contract with the required six-months' notice.

### *Breach of Contract*

"Under Ohio law, essential elements of a contract include: an offer, acceptance, the manifestation of mutual assent, and consideration (the bargained-for legal benefit or detriment)." *Revere Plastic Sys., LLC v. Plastic Plate, LLC*, 509 F. Supp. 3d 986, 996 (N.D. Ohio 2020). Ohio law mirrors the Uniform Commercial Code. "A purchase order constitutes an 'offer to buy goods for prompt or current shipment' and 'invit[es] acceptance by any manner and by any medium reasonable in the circumstances.'" *Id.* (quoting Ohio Revised Code ("R.C.") § 1302.09). *See also Am. Bronze Corp. v. Streamway Prods.*, 8 Ohio App. 3d 223 (Ohio Ct. App. 1982) ("Generally, the submission of a purchase order is viewed as being an offer which may then be accepted or rejected by the seller.").

The dispositive question in this case is whether the January 2017 Award contains the terms necessary to obligate Tenneco to a certain volume and duration. Tenneco claims that no contract existed prior to the Scheduling Agreements beginning in May 2017. In support, Tenneco argues there were no definite terms exchanged in the Award: "[A]n offer must be 'so definite in its terms,

5

or must require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain'" (Doc. 42-1 at 17) (quoting *LifeBio, Inc. v. Eva Garland Consulting, LLC*, 2023 WL 4549364, at *6 (S.D. Ohio 2023)). In response, MCS asserts the emails sufficiently "reflect the 'essential terms,' with [requisite] definiteness and certainty" (Doc. 45 at 19) (quoting *N. Side Bank & Tr. Co. v. Trinity Aviation, LLC*, 2020-Ohio-1470, ¶ 15 (Ohio Ct. App. 2020)).

Tenneco relies on *Revere Plastic Systems*, involving a blanket purchase order with no price term. 509 F. Supp. 3d. 986. The district court held that "[b]ecause it was not a requirements contract, nor was it a buyer's option, any 'agreement' contained no quantity term until [plaintiff] issued releases for 'firm' quantities." *Id.* at 999. MCS' claims in this case are different: "[I]n contrast, the situation involves a dominant and controlling business partner that issued an Award -- premised upon duration, quantity, and price terms -- that also required immediate capital expenditures" (Doc. 45 at 24).

Tenneco further points to *Babcock & Wilcox Co. v. Hitachi America, Ltd.*, 406 F. Supp. 2d 819 (N.D. Ohio 2005) for the proposition that "[w]here, as here, the purchase order contains a complete and final statement of all terms, including a detailed description of the good[s], price, payment terms, delivery specifications, and various other terms, as well as a statement that the seller's acceptance is conditioned on the terms in the purchase order, the purchase order is the offer" (Doc. 42-1 at 18). According to MCS, that case is also different because "the proposal itself was labeled a 'price quotation' and expressly 'called for further negotiation' [and] the parties expressly agreed that there remained 'open issues' . . ." (Doc. 45 at 22) (quoting *Babcock*, 406 F. Supp. 2d at 829–30).

Important here, a contract for the sale of goods must include price and quantity terms to be enforceable. *Tubelite Co., Inc. v. Original Sign Studio, Inc.*, 176 Ohio App. 3d. 241, 248 (Ohio Ct. App. 2008). Tenneco argues there was no specific volume or duration terms (Doc. 42-1 at 7):

> Because the component parts that Tenneco needed varied by program and over time based on Tenneco's own customers' orders, the Scheduling Agreement did not contain specific quantity terms. [] Rather, the quantity for each order was communicated to MCS on releases issued electronically through the SupplyWeb system against the Scheduling Agreement and via email.

But Tenneco provided MCS with specific figures for output -- 2,092,675 pieces per year (Doc. 43-15 at 2). As noted at the Hearing, this figure and the duration of the project were necessary for MCS to calculate the $0.395 cost per piece in its bid (Doc. 43-20). Tenneco was fully aware that MCS was relying on these figures to make improvements and calculate costs to meet the projections.

Under Ohio law, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *Extreme Mach. & Fabricating, Inc. v. Avery Dennison Corp.*, 2016-Ohio-1058, ¶ 23 (Ohio Ct. App. 2016) (quoting R.C. § 1302.07(A)). Throughout their relationship, MCS and Tenneco often acted informally in coming up with contract terms. For instance, during the summer of 2018, Call from MCS met with Burdine who demanded MCS pay a "productivity rebate" of $100,000, based on the fact that Tenneco had "spent over $1,000,000 with MCS over the last three years" (Doc. 45-1 at 60). After several back and forth emails, the parties agreed that MCS would pay Tenneco $5,600 for each of the next four quarters (Doc. 45-1 at 57–61). This is just one such instance of binding terms between the parties not contained in the Scheduling Agreements.

Here, questions of material fact remain with regard to the parties' intent at the time of the January 2017 Award, as well as whether the materials terms to form a contract were met. Such disputes on "issues regarding parties' intent, with respect to agreements or contracts, present

interpretive issues traditionally understood to be for the trier of fact." *United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227, 1234 (6th Cir. 1996) (internal quotation marks and citation omitted).

### *Quasi-Contract Claims*

MCS also asserts two quasi-contract claims -- promissory estoppel and fraudulent inducement (Doc. 1-2 at 23–24). Each is addressed in turn.

First, to prove a promissory-estoppel claim, MCS must show: "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance . . . ; and (3) injury resulting from such reliance." *Faurecia Auto. Seating, Inc. v. Toledo Tool & Die Co.*, 579 F. Supp. 2d 967, 973 (N.D. Ohio 2008) (citation omitted). Whether Tenneco "made 'a clear and unambiguous promise' is a question of fact." *Johnson v. Calhoun Funeral Homes, Inc.*, 2017 WL 661692, at *3 (N.D. Ohio 2017) (citation omitted). MCS alleges that Tenneco promised to purchase some two million pieces per year for six years. And, based on these promises, MCS incurred substantial costs preparing for the project.

The record includes sufficient evidence of reliance, including the purchase of equipment and expansion of warehouse space. Whether this reliance was reasonable is, again, a question for the jury to decide. *See Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899, 921 (S.D. Ohio 2009) ("The determination of whether a party has established the reliance element of a promissory estoppel claim is generally a question of fact for a jury to resolve.") (cleaned up).

Second, to prove fraudulent inducement, MCS must prove: (1) a breach of "a duty owed separately from that created by the contract"; and (2) "actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of the contract." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151 (1996). MCS bases this claim on "(1) representations concerning duration and volume of the T1XX program and (2) representation of availability of tooling dollars from [GM] . . ." (Doc. 45 at 28). The parties

8

negotiated over price and tooling dollars throughout 2015 and 2016. When GM eventually produced money for tooling, Tenneco remitted tooling money directly to MCS (*see* Doc. 43-33). There is no indication Tenneco knew of the money in advance and misrepresented to MCS that none was available. Indeed, some tooling money became available later from GM. Simply put, the record is bare that Tenneco did not intend to act in accordance with its representations from the outset. This claim fails as a matter of law.

## Conclusion

Tenneco's Motion for Summary Judgment (Doc. 42) is granted in part and denied in part. The fraudulent-inducement claim is dismissed with prejudice. However, because issues of material fact remain, the breach-of-contract and promissory estoppel claims shall proceed.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 26, 2024